Josephine L. LAWLER, Appellant

v.

WINDMILL RESTAURANT, Appellee,

and

U.S. Fidelity & Guaranty
Company, Appellee.

No. 16074.

Supreme Court of South Dakota.

Considered on Briefs Oct. 12, 1988.

Decided Jan. 18, 1989.

David L. Stanton, Rapid City, for appellant.

Dennis W. Finch of Finch, Viken, Viken & Pechota, Rapid City, for appellee.

WUEST, Chief Justice.

Josephine Lawler (Lawler) appeals a circuit court judgment affirming the decision of the South Dakota Department of Labor (Department) which denied her worker's compensation claim. We affirm.

Lawler was employed as a fry cook at the Windmill Restaurant (Windmill) in Rapid City, South Dakota. On August 20, 1981, she suffered an "acute myocardial event" while performing her regular duties at work. Lawler was immediately transported to the Rapid City Regional Hospital. There, her attending physician, Dr. Paul Dzintars, and a cardiologist, Dr. James Jackson, observed that she was experienc-

ing chest pains, poor skin color and cold sweats. They suspected that Lawler had suffered a myocardial infarction[1] and treated her accordingly.

On November 1, 1981, Lawler returned to work as a pastry cook at Windmill. She was discharged after thirty days because Windmill feared she would have another "heart attack" and believed she was unreliable as an employee. Thereafter, Lawler received unemployment compensation until late 1982. She then succeeded in obtaining two consecutive jobs, neither of which lasted more than four months. In both cases, Lawler was discharged for non-health reasons.

Lawler filed a claim for worker's compensation and a petition for a hearing before the Department on May 9, 1983. After an administrative hearing, the Department concluded that Lawler suffered a myocardial event on August 20, 1981, from which she later recovered. This event was precipitated by her employment at Windmill and constituted an "injury" within the meaning of SDCL 62–1–1(2).[2] As a result, Lawler was awarded temporary total disability benefits from August 20, 1981, to November 1, 1981. The Department further concluded that Lawler failed to prove that the myocardial event played any role in her disability after November 1, 1981. The preponderance of the medical evidence indicated this subsequent disability was at-tributable to a pre-existing coronary heart disease and other factors unrelated to work. The Department therefore denied Lawler's claim for permanent total disability benefits.

Both Windmill and Lawler appealed the Department's decision to the circuit court. The circuit court affirmed the Department's decision and Lawler now appeals from that decision to this court.

The only question before this court is whether the Department's determination that Lawler's permanent disability did not stem from her employment at Windmill is clearly erroneous. We hold that the factual determination made by the Department is not clearly erroneous.

Worker's compensation laws are remedial in character and entitled to a liberal construction. *Wold v. Meilman Food Industries,* 269 N.W.2d 112, 116 (S.D.1978). This rule of liberal construction, however, applies only to the law and not to the evidence offered to support a claim. *Id.* Issues of causation in worker's compensation cases are factual issues that are best determined by the Department. *Newbanks v. Foursome Package & Bar, Inc.,* 201 Neb. 818, 272 N.W.2d 372, 376 (1978). Unless such factual determinations made by the Department are clearly erroneous, we will not disaffirm them.[3] SDCL 1–26–36(5);

---

**1.** A myocardial infarction is defined as an interruption of the arterial blood supply to the heart muscle resulting in the death of part of the muscle tissue. Dorland's Illustrated Medical Dictionary 778 (25th ed. 1974). In layman's terms, a myocardial infarction is a heart attack.

**2.** SDCL 62–1–1(2) provides:

"Injury" or "personal injury," only injury arising out of and in the course of the employment, and shall not include a disease in any form except as it shall result from the injury[.]

**3.** In his dissenting opinion, Justice Henderson argues that the clearly erroneous standard of review is inapplicable to the present case. Instead, he claims that we need not give deference to the factual determination made by the Department because its determination essentially was based on the deposition testimony of three physicians who did not personally appear at the hearing. This determination, according to Jus-tice Henderson and the case authority cited by him, is not presumed to be correct.

Justice Henderson relies upon our previous decisions which, in fact, remain the law in this state. *See Pankratz v. Miller,* 401 N.W.2d 543 (S.D.1987); *Investigation of Highway Const. Industry,* 396 N.W.2d 757 (S.D.1986); *State v. Abourezk,* 359 N.W.2d 137 (S.D.1984); *Geo. A. Clark & Son, Inc. v. Nold,* 85 S.D. 468, 185 N.W.2d 677 (1971), *cert. denied,* 404 U.S. 833, 92 S.Ct. 82, 30 L.Ed.2d 63 (1971). We believe that Justice Henderson's reliance on the above-cited cases is misplaced and that his position is illogical. In these cases, this court held that the clearly erroneous rule of SDCL 15–6–52(a) does not apply to our review of deposition testimony where the deponent fails to appear before the trial judge. Careful scrutiny of these cases and the holdings stated therein (by someone "who has faithfully done his job as a Supreme Court Justice"), however, clearly indicates that these decisions relate to the rules of civil procedure and are limited in application to the *procedure*

*Permann v. Dept. of Labor, Unemp. Ins. D.,* 411 N.W.2d 113, 115 (S.D.1987); *S.D. Wildlife Federation v. Water Mgt. Bd.,* 382 N.W.2d 26, 32 (S.D.1986) (Wuest, J., dissenting); *Barkdull v. Homestake Min. Co.,* 317 N.W.2d 417, 418 (S.D.1982).

■ There is no presumption from the mere occurrence of an unforeseen or unexpected injury that the injury was in fact caused by an employment situation. *Newbanks,* 272 N.W.2d at 375. To recover disability benefits under the worker's compensation statutes, the claimant has the burden of establishing a "causal connection between the employment and the disability." *Kirnan v. Dakota Midland Hosp.,* 331 N.W.2d 72, 74 (S.D.1983) *(quoting Peterson v. Ruberoid Company,* 261 Minn. 497, 499, 113 N.W.2d 85, 86 (1962)). *See also* SDCL 62–1–1(2). The testimony of "professionals" is crucial in establishing this causal relationship because the field is one in which laymen ordinarily are unqualified to express an opinion. *Wold,* 269 N.W.2d at 115; *Podio v. American Colloid Co.,* 83 S.D. 528, 534, 162 N.W.2d 385, 388 (1968).

■ In the present case, the aforementioned principles mandate that Lawler demonstrate a causal connection between her work as a fry cook and her coronary heart disease. A careful review of the medical evidence reveals that Lawler failed to meet this burden. In their depositions, neither Dr. Dzintars nor Dr. Jackson stated that the myocardial event caused Lawler's permanent disability or that her work at Windmill caused or contributed to the heart disease she suffers. In fact, Dr. Dzintars testified that Lawler had recovered and was able to return to work.[4] Furthermore, Lawler submitted to a complete cardiovascular examination by Dr. Jorge Sanmartin on January 31, 1986. Dr. Sanmartin also reviewed the medical records relating to Lawler's hospitalization on August 20, 1981, and concluded that she had not suffered a myocardial infarction, but had endured an onset of angina pectoris.[5] Dr. Sanmartin later testified that Lawler was permanently disabled as a result of coronary heart disease and that the onset of this disease occurred at least ten years prior to the date of the myocardial event.

By insisting that this court review the deposition testimony in the present case as though it was presented here in the first instance, Justice Henderson urges us to engage in the fact finding process, thereby assuming the Department's role. This we refuse to do. The Department is in the best position to make factual determinations. We will not set aside such determinations unless they are clearly erroneous.

---

*in the circuit courts. See* SDCL 15–6–1; *Perrine v. Dept. of Labor,* 431 N.W.2d 156 (S.D.1988).

At issue in the present case is a factual determination made by an administrative agency. Administrative proceedings are governed by SDCL ch. 1–26. Unless otherwise provided by statute or by proclamation of this court, the rules of civil procedure do not apply to such proceedings. *Perrine,* 431 N.W.2d at 159.

Our applying the clearly erroneous standard when reviewing an agency's factual determination is mandated by SDCL 1–26–36(5) and our recent decision in *Permann.* Furthermore, the appropriateness of this standard of review is apparent after reading SDCL ch. 1–26 in its entirety. SDCL 1–26–18.1 requires that a hearing examiner propose findings of fact, conclusions of law and a decision after hearing all the evidence in a matter. This statute then permits the administrative agency to accept, reject or modify the findings, conclusions and decision upon its review thereof. The adversely affected party is also afforded the opportunity to present additional written and oral arguments if a "majority of the officials of the agency who are to render the final decision have not heard the case or read the record." SDCL 1–26–24. In light of these statutory provisions, it is clear that the agency not only has been entrusted with the fact finding process, but also is best suited for this task regardless of the manner in which evidence is presented.

**4.** After examining Lawler on September 29, 1983, Dr. Jackson determined that she was "functionally, significantly impaired" and that she should not work. Dr. Jackson's determination was based upon Lawler's obesity and history of heavy smoking and heart disease.

**5.** Angina pectoris is the chest pain or discomfort a person suffers due to deficient oxygenation of the heart muscle. The attack is momentary and often the individual recovers without any permanent damage to the heart muscle. Comment, *Heart Injuries Under Workers' Compensation: Medical and Legal Considerations,* 14 SUFFOLK U.L.REV. 1365, 1376–77 (1980).

Dr. Sanmartin's conclusion was based upon the absence of an abnormal Creatine Phosphokinase level at the time of Lawler's myocardial event. Creatine Phosphokinase is a cardiac enzyme which is specific for myocardial infarction.

We conclude that Lawler failed to meet her burden of proving that her coronary heart disease arose out of and in the course of her employment at Windmill. The determination by the Department regarding the cause of Lawler's permanent disability is not clearly erroneous.[6] Accordingly, the order of the circuit court upholding the Department's decision is affirmed.

MORGAN and MILLER, JJ., concur specially.

SABERS, J., concurs in result.

HENDERSON, J., dissents.

MORGAN, Justice (concurring specially).

I concur in the views expressed in the majority opinion except with respect to our review of deposition testimony. In that regard, I agree with the view expressed by the dissent to the extent that it was previously stated by this court in *Wold v. Meilman Food Industries*, 269 N.W.2d 112, 115 n. 2 (S.D.1978).

It is my perception that the problem raised is not our review of deposition testimony de novo in administrative appeals. I believe that the real conflict is between the application of that review by the dissent and two tenets of appellate administrative review, namely: (1) the question is not whether there is substantial evidence contrary to the agency finding, but whether there is substantial evidence to support the agency finding. *Application of Ed Phillips & Sons Company*, 86 S.D. 326, 195 N.W.2d 400 (1972); and (2) the court shall give great weight to the findings made and inferences drawn by an agency on questions of fact. SDCL 1–26–36, *Finck v. Northwest School Dist. No. 52–3*, 417 N.W. 2d 875 (S.D.1988).

In *Wold,* supra, where the trial court had reversed an agency decision awarding benefits, we affirmed the trial court decision, even though the doctor's deposition testimony was offered before the agency in support of the award. Thus the scope of our review is not necessarily the determining factor.

In this case, granted that there is testimony of Dr. Jackson that would support a view contrary to the agency decision, there is also other medical testimony, in the deposition of Dr. Sanmartin, that supports the finding of the agency. Therefore, applying the *Phillips & Sons* admonition along with the statutory directive that we give the findings and inferences of the agency great weight on questions of fact, I concur in the majority opinion.

I am authorized to state that Justice MILLER joins in this special concurrence.

SABERS, Justice (concurring in result).

Although I concur with the result reached by the majority, I agree with the scope of review expressed by Justice Henderson for deposition testimony.

HENDERSON, Justice (dissenting).

This is another exciting challenge to right a great wrong. A wrong perpetrated upon one of the most defenseless in our society, a kitchen worker in a truck stop earning $4 per hour. Under our statutes, under the settled law of this state, under foreign authorities (see, for example, *Carpino v. Treasure Chest Restaurant*, 106 A.D.2d 782, 483 N.Y.S.2d 817 (1984)), and under Larson's on Workmen's Compensation, she is entitled to win this appeal. I am reminded of words, found in St. John, that one must seek first the truth and it shall set you free. Passion and strength for that which is right and good and true must be the quest of the Law. By upholding this downtrodden lady's cause, I elevate the corpus and spirit of the law, not to mention my own spirit. And, it makes me free. Law is a majestic calling. It can

---

**6.** The dissent has rendered a "medical opinion" contrary to the findings of the hearing examiner. Although, like Justice Henderson, we sympathize with Lawler and her plight, our decision in this case is limited to whether or not the Department's determination was clearly erroneous. Based upon the evidence, the Department's conclusion was not clearly erroneous. Both the Department and the circuit court decided that Lawler suffered a myocardial event arising out of her employment, that she recovered from the same, and that she was not permanently disabled as a result of that event.

make you soar, like the eagle. On its wings, as you fight for the right, it can exhilarate you like the mountain air. It is, unquestionably, one of the noblest efforts the world still affords.

Digesting the majority opinion will readily disclose a paucity of facts. Without facts upon which to build a conceptual platform, a case is difficult to put in perspective. Thus, the reader should be given some facts to consider. There is a finding below, which the majority opinion totally deletes, quite vital to an appreciation of why the circuit court should be reversed for affirming the Department of Labor. This lady is entitled, under the settled law of this state, and under the state of this record, to worker's compensation.

First of all, the decision of the Deputy Director of the Department of Labor is this: A "myocardial event" arose out of and in the course of her employment. This was an "injury." Appellee filed no notice of review and therefore it is an absolute given that the "myocardial event" arose out of and in the course of her employment, causing injury.[1] Yet, incredibly, the Deputy Director then denied this woman permanent benefits. This was error of law.

Controlling precedent in this Court exists in *Kirnan v. Dakota Midland Hosp.*, 331 N.W.2d 72 (S.D.1983), which, in my opinion, has been shunted aside although the majority opinion cites it. Writing for this Court in *Kirnan*, Justice Dunn gave us a historical background on what constituted an injury and noted that the 1975 Legislature deleted the phrase "by accident" from the definition of injury. As Justice Dunn further pointed out, by deleting the phrase "by accident," South Dakota joined such states as California, Iowa, Maine, Massachusetts, Minnesota, Pennsylvania, and Rhode Island in eliminating that requirement. Note 1B A. Larson, *The Law of*

*Workmen's Compensation* § 37.10, at 7–1 (1987). In deleting "by accident," the unusual exertion requirement was likewise rejected. In South Dakota, in *Kirnan*, 331 N.W.2d at 74, we stated: "We agree with the approach taken by Minnesota and other jurisdictions which have deleted 'by accident' from their statutes and we too choose to abandon the unusual exertion requirement." However, in *Kirnan*, we cited the Minnesota Supreme Court case of *Peterson v. Ruberoid Co.*, 261 Minn. 497, 499, 113 N.W.2d 85, 86 (1962), with approval and for the rule that the *claimant has a burden of establishing a causal connection between the employment and the disability.* Said Minnesota case, quoted in *Kirnan*, further held that it had to be established that the heart attack was brought on by strain or overexertion incident to the employment, though the exertion or strain need not be unusual *or other than that occurring in the normal course of the employment.* See *Kirnan, id.* at 74.

It was error for the administrative agency and the circuit court to hold and find that there was no credible evidence in the record to establish causation regarding her permanent disability. There is a plethora of evidence, contained in four depositions on file herein, to substantiate a causal connection between the employment (heart attack) and the disability. Four depositions, two from Dr. Jackson, are on file herein. These depositions were considered by the administrative agency. The circuit court, in reality, affirmed the impressions by the administrative agency of these four medical depositions. Only three live witnesses appeared before the labor referee and they were claimant, Robert Michael McDonald, and Janet Lewis. These witnesses do not pertain to medical expertise. And it is, on medical expertise, that this Court makes its decision. I have reviewed several cases in this Court concerning deposition witnesses.

---

1. The Deputy Director's Conclusions of Law Nos. III and IV, respectively, are as follows:

   That while the evidence is conflicting, I conclude that on August 20, 1981, the Claimant suffered a myocardial "event" *precipitated by her employment* with the Employer herein and that such "event" is an "injury" within the

meaning of SDCL 62–1–1(2). (Emphasis added.)

   That as a result of said injury, the Claimant is entitled to temporary total disability benefits from August 20, 1981 to November 1, 1981, and her medical/hospital expenses to that date.

Contrary to the majority opinion, which walks this Court down a road of wrong review, the clearly erroneous rule does not apply to the depositions of witnesses who did not personally appear at trial. This reviewing Court is not bound by a presumption of correctness of the trial court's finding as to evidence, or the referee's finding, when the evidence can be as fully examined upon review, as upon the original trial or hearing. All that Judge Zinter did, in this case, was to simply review the record and say that the referee made no bad decision on findings of evidence or conclusions of law. No deference need be given to Judge Zinter's ruling on depositions because it is settled law, in this state, that his decision has no presumption of correctness. This goes back as far as *Geo. A. Clark & Son, Inc. v. Nold,* 85 S.D. 468, 185 N.W.2d 677 (1971); *Ayres v. Junek,* 247 N.W.2d 488 (S.D.1976). Careful scrutiny of precedent in this Court reveals that, in reviewing workers compensation administrative proceedings, medical expert testimony *"submitted by deposition can be reviewed by both the trial court and this court unhampered by the clearly erroneous rule." Wold v. Meilman Food Indus.,* 269 N.W.2d 112, 115 n. 2 (S.D.1978) (emphasis added). This totally destroys the academic thesis of footnote 3 of the majority opinion.[2] Now, let us pierce with real scrutiny, the depositions. Dr. Dzintars, on page 11 of his deposition, states: "I felt she had a heart attack." Counsel asked him: "Was that a myocardial infarction?" And he answered: "The same thing." Dr. Dzintars also expressed, under oath, on page 20 of his deposition, that "[c]linically, I felt she did have heart attack. Dr. Jack-

son felt the same thing. Now, if she *absolutely* had it, I have no way to prove that." (Emphasis added.) Apparently, this Court upholds the referee in his conclusion of law that a medical diagnosis has to be "absolute." Of course, that is not the rule in this state. *See Thomas v. St. Mary's Roman Catholic Church,* cited in footnote 7 below. On pages 5 and 6 of Dr. Jackson's deposition, he testified that the diagnosis "was probable myocardial infarction and certainly the diagnosis was coronary artery disease or ischemic heart disease, same thing, different name." He immediately followed with the statement: "The concern was that the patient was indeed developing a large amount of heart damage." *Supra,* at page 6. He further indicates, on page 6, that "an acute process had taken place and it subsequently resolved." He further testified, at page 6, concerning the heart damage: "This [heart damage] is documented in the medical record by the fact that the cardiograms were changed and they had changed for several days in a row and then began to show some improvement." On the bottom of page 8 and the top of page 9 of his deposition, he states: "The tests that we are discussing show objective evidence of some damage to the heart. And certainly this would reduce her heart's and therefore her capability to perform physical exertion." Both treating doctors reflected upon the fact that Dr. Jorge Sanmartin was not truly in a position of understanding the distress, symptoms, and myocardial event because he was not there at the time to witness these severe symptoms manifested by the claimant. For the benefit of the reader, I quote this testimony,

**2.** Footnote 3 of the majority opinion suggests that the hearings examiner heard all the evidence in the matter; quite to the contrary, he only *read* the three depositions; therefore, the majority opinion simply does not understand that a deference is given to a judge or a hearings examiner when a witness personally appears before him and can thereby see and hear the witness and give that witness credibility based upon the intangibles of appearance, forthrightness, and demeanor on the stand. This hearings examiner never had *these three witnesses* before him. He read a cold record, just like Judge Zinter and just like the minority writer did. General authorities, cited by the majority

opinion in paragraph two of footnote 3, are totally inapposite when there is a precise case on point in this state, namely, *Wold v. Meilman Food Indus.,* 269 N.W.2d 112 (S.D.1978). When I, as a Justice, review a deposition, I may do so without paying deference to either the hearings examiner or the circuit judge. I violate no rule as a "factfinder" which footnote 3, of the majority opinion, purports to ascribe to me. Footnote 3 of the majority opinion, conceptually, is contrary to settled authority and against valid legal reasoning. To trumpet that the minority viewpoint is "illogical" is to persuade by adjective, rather than by analysis.

questions by Mr. Stanton and answers by Dr. Sanmartin.

Q: And you were employed by Mr. Finch, the defense counsel, to give her an examination to make a case—

A: Yes.

Q: —for the insurance company defendant; is that correct?

A. That's correct.

(Sanmartin Deposition, at page 12.)

The preponderance of the medical testimony was in favor of the claimant and against the defendant and only a total reliance upon Dr. Sanmartin's testimony, who was not the treating physician, and a complete rejection of the other two doctors, both of whom were the treating physicians and witnessed this lady when she had the heart attack, can cause the result at the referee's hearing, the trial court's reaffirmance of same, and this Court's affirmance. Therefore, denying her worker's compensation is reversible error. Contrary to the majority writer's footnote 6, this writing of the minority opinion is not based on sympathy. Rather, it is based upon a careful scrutiny of three medical opinions rendered by three practicing physicians. Only an opinion of the hired gun, Dr. Sanmartin, can be effectively used as an instrument to destroy this lady's cause in the courts. In footnote 3 of the majority opinion, the majority opinion fails to observe stare decisis. Contrary to footnote 3, Justice Henderson is not urging a new rule but is reaffirming a rule established in 1978. It is not my job to cooperate with administrative agency decisions; I am paid by the people of South Dakota to check on executive and legislative agencies. This is my function as part of the "checks and balances" system established by the forefathers of this Nation. Justice Dunn, writing for this Court in *Kirnan,* expressed:

> While we acknowledge that establishing causality in heart attack cases is not a precise art, and that her attack cannot be assigned to any unusual exertion or strain on that morning, it is nevertheless compensable under the amended statute and our interpretation of that statute.

*Kirnan,* 331 N.W.2d at 75. Again, Justice Dunn pointed out that "[w]hile there must be a causal connection between the employment and the disability, 'the exertion or strain need not be *unusual* or other than that *occurring in the normal course of the employment.*'" *Kirnan,* 331 N.W.2d at 75 (emphasis in original) (quoting *Peterson v. Ruberoid Co.,* 261 Minn. 497, 499, 113 N.W.2d 85, 86 (1962)). This lady definitely had a "myocardial event" occurring in the normal course of the employment, and therein lie a total misperception in the majority opinion.

This lady earned $4 per hour and worked 40 hours per week. Although she was obese, it had not affected her work previously. To tender her obesity as some type of a defense is preposterous; like many cooks, and like many people in our society, she was heavy; however, she was a heavy-set lady when the restaurant hired her. As *Larson* instructs us, the restaurant took her, as they found her and particularly with any type of latent heart disease that she had. 1 A. Larson, *The Law of Workmen's Compensation* § 12.21, at 3–348.32 (1985). Up to the time of her myocardial event, while she was on duty, she had never suffered from heart problems. This is uncontroverted in the evidence. In fact, her doctor, Dr. Dzintars, *before her myocardial event,* had placed her on a weight control program; thereby, she lost fifty pounds and had successfully brought her blood pressure down to normal. Five months prior to her myocardial event, she had quit indulging in alcoholic beverages and smoking. This lady was a fry cook which is a very difficult position in a busy restaurant. A la carte orders are singular and must be prompt. Due to the Central State's Fair in Rapid City, with people returning home with their livestock, she had increased workload pressures, as drivers were stopping their livestock trucks and trailers, then eating at the Windmill Restaurant, then departing. Her environment was almost unbelievable in that the grills were set at 300 to 375 degrees. Ultraviolet lights beamed down from above. Steam tables were close to her. Boiling grease, in deep fat fryers, were near her. There was

testimony, also, that the area was so hot that if an egg was dropped on the floor, it would literally fry. This working environment, mentioned above, stands undisputed.[3] She had to carry heavy bundles of food and often, in a daily routine, would go from this extreme heat to a cooler where there were subnormal temperatures, and, worse, to a freezer. All of this work, she was doing at the time of her myocardial event. In fact, she had just previously carried out groceries for the anticipated cooking at the grill, and had begun frying eggs; she bent down to get eggs from a lower shelf and was thereupon stricken with a "myocardial event." Surely, under the writing of Justice Dunn, and our 1983 holding, this exertion was occurring in the normal course of the employment. In *Kirnan*, 331 N.W.2d at 75, Justice Dunn emphasized, as I have quoted above, "[t]he doctor conceded that appellant may have had a coronary condition for many years, but in his opinion *the precipitating event* of the coronary occlusion, the closure of the blood vessel, was the work she was doing that day'...."[4] (Emphasis added.) Dr. Jackson was her treating physician. He was not a hired gun, brought in by an insurance company, four and one-half years later, such as we see in the instant case in the manifestation of Dr. Sanmartin.[5]

As I review this case, it is abundantly clear, that this lady is totally and permanently disabled due to her heart condition. Even Dr. Sanmartin, the hired gun, said so. She tried to work for thirty days as a part-time pastry cook; she could not do so.

Upon entering a State Vocational Rehabilitation Program, it was determined that this lady could not be rehabilitated or retrained for jobs due to her limited work experience and her serious heart condition. Two jobs were obtained for her; in both, she failed to hold employment. In point of fact, she has not held full-time gainful employment since her myocardial event.

The majority opinion rests on Dr. Dzintars' recommendation that she return to work and Dr. Sanmartin's testimony that her permanent disability stemmed from long-standing coronary heart disease. This is untenable. The record indicates that the work Dr. Dzintars let her return to was a part-time job as a pastry cook, in far less stressful circumstances. In point of fact, it was a four-hour per day job. She was fired from this position, after working for approximately thirty days, because her employer feared she would have a heart attack. She could not handle the reduced stress. Therefore, for the referee to conclude, as a matter of law, that her permanent disability (apparently now conceded by all) resulted from "heart disease" flies in the face of common sense and logic. Heart disease, or no heart disease, she was able to work until she suffered a "myocardial" event or "heart attack" on the job. The *precipitating event* was the work that she was doing that day, per the testimony of her treating physician. Dr. Dzintars also related that her heart was damaged by the myocardial event she had already suffered.[6] The testimony of Drs. Dzintars

---

3. A 35–year-old healthy co-worker quit because of (a) constant motion, and (b) tremendous heat.

4. Dr. Jackson testified that this lady's work at the Windmill, more likely than not, was the *precipitating factor* causing the myocardial infarction. Three immediate diagnoses: Dr. Gerti Janss—coronary arrest; Dr. Dzintars (her regular doctor, called in by Dr. Janss)—myocardial infarction; and Dr. Jackson (cardiologist, called in by Dr. Dzintars)—confirmed myocardial infarction.

5. Dr. Sanmartin failed to perform a gated heart scan or a stress EKG, both vital to determine heart damage.

6. If the majority opinion is so academically bankrupt that it must resort to attacking an

opposing viewpoint by singling out the minority viewpoint by name and then accusing the minority viewpoint author of rendering a personal medical opinion, then it is perfectly proper that this writer highlight the (a) paucity of facts which the majority opinion did not permit the Bar and the Bench to absorb for a fair review, (b) neglect in not distinguishing facts of this case with the controlling case involving heart attacks in worker's compensation cases in South Dakota, *Kirnan*, (c) total oversight by the majority opinion in recognizing worker's compensation law as it applies to preexisting conditions (not one authority or distinguishment by the majority opinion on this subject!). In short, the academic effort is myopic, lacking intensity of review.

and Sanmartin reflected the *possibility* that she suffered only an angina episode, yet the overwhelming balance of their testimony was that angina attacks are a continuing problem.[7] One attack will be followed by others. No such history is recorded here. Therefore, angina is not supported by the evidence.[8] As this Court wrote in *Oviatt v. Oviatt Dairy, Inc.,* 80 S.D. 83, 95, 119 N.W.2d 649, 656 (1963), "[t]he value of an opinion from an expert is dependent on and entitled to no more weight than the facts as a foundation therefor, and unless the basis of such opinion is supported by proper facts, it is without probative value." Also, note that Dr. Sanmartin was not a treating doctor. He merely looked at old, dry records. Yes, some four and one-half years after this lady's heart attack. Both treating physicians, in depositions, appeared to fault Dr. Sanmartin's opinion, insofar as his opinion in this case was concerned, because he was not at the hospital and did not actually see nor immediately follow this lady's heart attack after she was stricken. The record does not support denial of this lady's benefits.

Error of law is manifested in the majority writing where it stresses Dr. Sanmartin's testimony that this lady was permanently disabled as a result of coronary heart disease that set in at least ten years before the myocardial event. *Permann v. Department of Labor,* 411 N.W.2d 113 (S.D.1987). This is not sufficient to deny benefits under *Kirnan* and other recent cases. In *Kirnan,* benefits were awarded in spite of a preexisting coronary disease.

See *Oliver v. City of Albuquerque,* 106 N.M. 350, 742 P.2d 1055 (1987) (preexisting arteriosclerosis); *Tocco v. City of Great Falls,* 714 P.2d 160 (Mont.1986) (arteriosclerosis and hypertension); *Ex parte Lewis,* 469 So.2d 599 (Ala.1985) (ability to work unaffected by arteriosclerosis prior to work-related heart attack). Here, where this woman was able to work up to the time of her "myocardial event," and was never thereafter as capable as she had been before, and Dr. Jackson, the treating cardiologist, insisted that her work precipitated the incident, this Court should not, under *Kirnan* and other recent case law, deny this woman her due. Preexisting heart and vascular problems which are exacerbated and aggravated by work-related stress *are* compensable under Worker's Compensation. *Wells/Richard Mfg. Co. v. Workmen's Compensation Appeal Bd.,* 69 Pa.Cmwlth. 179, 450 A.2d 766 (1982). Again, I wish to mention that in worker's compensation law, the same as we witness in general tort law, the employer takes the employee as he finds him/her. Preexisting conditions, such as being overweight or heart disease, do not defeat this claim. *See* 1 A. Larson, *The Law of Workmen's Compensation* § 12.21, at 3–336 (1985). *See Conway Convalescent Center v. Murphree,* 266 Ark. 985, 588 S.W.2d 462 (1979), for case of obese female injured while working. It is interesting to note that in the Arkansas case, the Arkansas Court noted how the obesity and the injury had become inseparably intertwined into a vicious cycle. Here, this lady gained a tremendous amount of weight, *after* her heart

---

7. Medical possibilities, by way of opinion, are not valid under the settled law of this state. The settled law of this state is that a medical opinion must be based upon a "reasonable medical probability." *See Thomas v. St. Mary's Roman Catholic Church,* 283 N.W.2d 254, 258 (S.D.1979).

8. Possibilities of angina cannot be a basis for a finding of angina. The majority opinion has the unmitigated audacity to so reflect in footnote 5, that this special writer has rendered a "medical opinion." Obviously, someone has failed to read the depositions in this case. On page 10 of Dr. Jackson's deposition, Dr. Jackson explicitly testified that there was congestive heart failure and that "[g]enerally angina attacks or episodes

that tend to recur in and of themselves will not cause congestive heart failure." The entire thread of Dr. Jackson's deposition was that this lady did not have angina. And he expressed that this was consistent with Dr. Dzintars' opinion. Therefore, this special writer, who has faithfully done his job as a Supreme Court Justice, in carefully scrutinizing this record, to be exact on the expressions of the medical opinions, is personally demeaned for rendering a supposed "medical opinion" in footnote 5. Such a statement is a defilement of this record and a totally unfounded and unwarranted personal attack on someone who still has the fortitude and the time to painstakingly review the records and depositions.

attack and inactivity. This fact, also, the insurance company and its expert want to use against her. In point of law, her weight increase becomes a part of the compensable injury. *See* 1 A. Larson, *The Law of Workmen's Compensation* § 13.11(b), at 3–363 (1985). The majority opinion, here, does not comport with *Kirnan.*

It is, of course, easy to create a corpus of law. Quantity of litigation can produce a large body of law. But what is more important, the body of the law in any given court or the spirit of the law? With this writing and these authorities, the spirit for the right should overcome the body of a great wrong. In summary, I would reverse, and direct that the circuit court and referee award compensation as required by these sound authorities.

### SEQUEL

Fleeting thoughts of a sixty-year-old jurist reminded him of the poetry he eagerly pored over as a youth. A phrase haunted him in the context of this case: "The plowman homeward plods his weary way, And leaves the world to darkness and to me." Sought he "The Literature of England" to track down the haunting phrase and found it in Thomas Gray's (1716–1771) "Elegy Written in a Country Churchyard." Realized in reading same, after lo these many years, the universality of the appeal of this writing and a reoccurring theme therein, the transiency of human labor. Many famous lines contained in this Elegy which have been used for two centuries and drawn upon to write a book or a play. Examples: "The paths of glory lead but to the grave" and "Far from the madding crowd's ignoble strife." In the context of this case, I quote one stanza:

Let not Ambition mock their useful toil,
  Their homely joys, and destiny obscure;
Nor Grandeur hear, with a disdainful smile,
  The short and simple annals of the poor.

Gray's Elegy made a great mark upon literature and mankind because of its exaltation of laboring masses and lowly folk. Spirit begot his writing. Respect for the "annals of the poor" and a commensurate respect for their way of life—was immortalized in the English language.