John FOLTZ, Claimant and Appellant,

v.

WARNER TRANSPORTATION,
Employer and Appellee,

and

Cigna Insurance Company of North
America, Insurer and Appellee.

No. 18372.

Supreme Court of South Dakota.

Considered on Briefs Jan. 11, 1994.

Decided May 25, 1994.

Rehearing Denied July 1, 1994.

Richard D. Casey, Strange, Farrell, Johnson & Casey, P.C., Sioux Falls, for claimant and appellant.

R. Alan Peterson and Marsha Stacey, Lynn, Jackson, Shultz and Lebrun, Sioux Falls, for appellees.

WUEST, Justice.

John Foltz (Foltz) appeals from the circuit court's judgment affirming the Department of Labor's (Department) denial of workers' compensation benefits. We reverse.

## FACTS

On February 19, 1990, John Foltz (Foltz) was involved in an accident while employed by Warner Transportation (Warner). Foltz was a thirty-two year old over-the-road truck driver with a ninth grade education. The accident occurred in the mountains of California following a snowstorm. An automobile pulled in front of another Warner truck just ahead of the truck Foltz was driving; the first Warner truck hit its brakes, then Foltz applied the brakes, but slid into the back of the truck in front of him on the downhill side of the mountain. Although travelling at a slow speed and wearing a seat belt, Foltz slid forward and hit the top of his head on an instrument panel above the truck windshield. Foltz was immediately unable to continue driving because of dizziness and blurred vision, so an extra driver in the other Warner truck drove to Los Angeles while Foltz laid in the sleeper. Physicians at the Los Angeles emergency room advised Foltz to see a neurologist and not to drive for several days; eventually, at Warner's urging, Foltz drove to Phoenix, but then sought further medical attention at a Phoenix hospital emergency room. After several days, Warner had Foltz flown home, and he was sent to Sioux Falls neurologist Dr. Warren Opheim. Additional facts about Foltz' examinations and consultations with Dr. Opheim and other physicians are recounted in a subsequent section on expert testimony.

Warner was insured for workers' compensation purposes by Cigna Insurance Company (Cigna). Foltz filed a petition for hearing before the South Dakota Division of Labor and Management of the Department of Labor (Department), claiming that he was permanently and totally disabled as a result of a loss of peripheral vision suffered by him in the trucking accident. After a hearing, the hearing officer issued his decision denying Foltz any workers' compensation benefits, and entering findings of fact, conclusions of law, and an order on August 3, 1992. In its findings of fact, the Department most notably stated:

### XXXIV.

The weight of the medical testimony is in favor of Employer and Insurer, that Claimant has not sustained a loss of peripheral vision.

\* \* \* \* \* \*

### XXXVII.

Claimant has failed to meet his burden of proof that he has any loss of peripheral vision, and, therefore, an award for loss of peripheral vision is denied.

Foltz' petition for review with Department was denied. Foltz appealed to the circuit court; based on a review of the briefs and Department record, the circuit court affirmed the Department, entering a judgment

to that effect on March 25, 1993. It is from that judgment that Foltz appeals.

## STANDARD OF REVIEW

■■ In administrative appeals, the standard of review is generally governed by SDCL 1–26–36 [1] and –37 [2]. *In re Northwestern Bell Tel. Co.*, 382 N.W.2d 413, 415–16 (S.D.1986); *Caldwell v. John Morrell & Co.*, 489 N.W.2d 353, 357 (S.D.1992). Under SDCL 1–26–36, questions of law are fully reviewable, with no deference given to the agency's conclusions of law. *Caldwell*, 489 N.W.2d at 357; *In re State & City Sales Tax Liab. of Quality Serv. Railcar Repair Corp.*, 437 N.W.2d 209, 210–11 (S.D.1989) (citing *Permann v. Dep't of Labor*, 411 N.W.2d 113 (S.D.1987)); *see U.S. West Commun., Inc. v. Public Util. Comm'n*, 505 N.W.2d 115 (S.D. 1993). We also note that generally, when the issue in an administrative appeal is a question of fact, we apply the clearly erroneous standard. *Quality Serv. Railcar*, 437 N.W.2d at 211. "A finding is 'clearly erroneous' when after reviewing all of the evidence, we are left with a definite and firm conviction that a mistake was made." *Selle v. Pierce*, 494 N.W.2d 634, 636 (S.D.1993) (citations omitted).

■ At the commencement of the hearing in this case, counsel agreed to limit the issues to whether Foltz had suffered a loss of peripheral vision and if so, whether his peripheral vision was now less than twenty degrees, thus constituting permanent and total im-

pairment by statute. The purpose of the proceeding was not to delve into the vocational aspects of the workers' compensation claim. Thus, in this appeal, *we are largely faced with a question of fact:* Does Foltz suffer from a loss of peripheral vision or not? Review of this factual question would normally require us to apply the clearly erroneous standard. In this administrative appeal, the circuit court's decision was based entirely on the written record from the agency. "We are fully as capable of reading the agency record as was the trial court. We may therefore review the agency record in the same light as does the trial court to determine whether or not the agency's decision was clearly erroneous in light of all the evidence in the record." *In re Northwestern Bell Tel. Co.*, 382 N.W.2d 413, 416 (S.D.1986). However, in this case, almost all of the expert testimony that would aid the factfinder in determining whether Foltz suffered a loss of peripheral vision was presented via deposition, affidavit and exhibit. In this regard, we have stated: *"When reviewing evidence presented by deposition, we do not apply the clearly erroneous rule but review that testimony as though presented here for the first time."* *Day v. John Morrell & Co.*, 490 N.W.2d 720, 723 (S.D.1992) (citing *Lien v. Miracle Span Corp.*, 456 N.W.2d 563, 565 (S.D.1990)); *Northwestern Bell*, 382 N.W.2d at 415–16). *See Wold v. Meilman Food Indus.*, 269 N.W.2d 112, 115 n. 2 (S.D.1978) (stating that deposition testimony of a treat-

1. SDCL 1–26–36 provides:
    The court shall give great weight to the findings made and inferences drawn by an agency on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions or decisions are:
    (1) In violation of constitutional or statutory provisions;
    (2) In excess of the statutory authority of the agency;
    (3) Made upon unlawful procedure;
    (4) Affected by other error of law;
    (5) Clearly erroneous in light of the entire evidence in the Record; or
    (6) Arbitrary and capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

A court shall enter its own findings of fact and conclusions of law or may affirm the findings and conclusions entered by the agency as part of its judgment. The circuit court may award costs in the amount and manner specified in chapter 15–17.

2. SDCL 1–26–37 (1992) provides:

    An aggrieved party or the agency may obtain a review of any final judgment of the circuit court under this chapter by appeal to the Supreme Court. The appeal shall be taken as in other civil cases. The Supreme Court shall give the same deference to the findings of fact, conclusions of law and final judgment of the circuit court as it does to other appeals from the circuit court. Such appeal may not be considered de novo. *Id.*

ing physician can be reviewed by this court "unhampered by the clearly erroneous rule") (citing *Ayres v. Junek*, 247 N.W.2d 488, 490 (S.D.1976)); *Geo. A. Clark & Son, Inc., v. Nold*, 85 S.D. 468, 474, 185 N.W.2d 677, 680 (1971) (stating that where the clearly erroneous rule does not apply, this court is not burdened with a presumption in favor of the trial court's determination); *State Auto. Casualty Underwriters v. Ruotsalainen*, 81 S.D. 472, 479, 136 N.W.2d 884, 888 (1965) (noting that when reviewing deposition testimony, this court is "unhampered by the rule that a trial judge who has observed the demeanor of the witnesses, is in a better position to intelligently weigh the evidence than the appellate court."). Under this standard, "we will decide for ourselves the credibility of the deponents and the weight and value to be attached to their testimony." *Caldwell*, 489 N.W.2d at 357. More recently, we have restated and reaffirmed this rule:

> When reviewing evidence presented by deposition, we do not apply the clearly erroneous rule but review that testimony as

though presented here for the first time. [Citations omitted.] The question is not if there exists evidence contrary to the agency's finding, but is there substantial evidence to support the agency's finding?

*Guthmiller v. South Dakota Dep't of Transp.*, 502 N.W.2d 586, 588 (S.D.1993) (citing *Day*, 490 N.W.2d at 723–24; *Lien*, 456 N.W.2d at 565; *Oberle v. City of Aberdeen*, 470 N.W.2d 238, 245 (S.D.1991)).[3]

It is also useful to note the burden of proof in workers' compensation cases. Generally, to establish a workers' compensation claim, the " 'claimant has the burden of proving all facts essential to compensation[.]' " *Phillips v. John Morrell & Co.*, 484 N.W.2d 527, 530 (S.D.1992) (quoting *King v. Johnson Bros. Constr. Co.*, 83 S.D. 69, 73, 155 N.W.2d 183, 185 (1967)). "The employee's burden of persuasion is by a preponderance of the evidence." *Caldwell*, 489 N.W.2d at 358. An earlier statement of this court expanded on the concept of the employee's burden of persuasion, stating:

3. In *Lawler v. Windmill Restaurant*, 435 N.W.2d 708, 709 (S.D.1989), this writer stated that: "[F]actual issues ... are best determined by the Department. *Newbanks v. Foursome Package & Bar, Inc.*, 201 Neb. 818, 272 N.W.2d 372, 376 (1978). Unless such factual determinations made by the Department are clearly erroneous, we will not disaffirm them." *Id.* at 709 n. 3 (citations omitted). It remains this writer's position that when reviewing a factual determination made by an administrative agency, we should apply the clearly erroneous standard of SDCL 1–26–36(5), regardless of whether the testimony was presented by live or documentary means. I believe that we have erred in adopting the standard of review as expressed in *Guthmiller* when considering administrative appeals. Early cases expressing the de novo review of deposition testimony were civil appeals. *See, e.g., Ayres*, 247 N.W.2d at 490 (citing SDCL 15–6–52(a)) (action seeking reimbursement for repairs); *Geo. A. Clark & Son*, 85 S.D. at 474, 185 N.W.2d at 680 (citing SDCL 15–6–52(a)) (action to enforce lien); *State Auto.*, 81 S.D. at 479, 136 N.W.2d at 888 (declaratory judgment action to determine rights and obligations under automobile liability policy); *Fulwider v. Benda*, 62 S.D. 400, 401, 253 N.W. 154, 155 (1934) (action to enforce levy of attachment). Further, it appears that South Dakota stands alone in taking the position that a de novo review applies to deposition testimony in an administrative appeal. *See, e.g.*, the following workers' compensation appeals, all including deposition testimony in the records: *Strate v. Al Baker's Restaurant*, 864 S.W.2d 417 (Mo.App.

E.D.1993) (court looks only to evidence most favorable to commission decision); *Darner v. Southeast Idaho In–Home Services*, 122 Idaho 897, 841 P.2d 427 (1992) (court construes entire record most favorably to prevailing party); *Hughes v. Dep't of Labor and Indus.*, 253 Mont. 499, 833 P.2d 1099 (1992) (court will overrule Department's determination only if found "clearly erroneous" in view of reliable, probative, and substantial evidence on the whole record); *Hernandez v. Hawkins Constr. Co.*, 240 Neb. 129, 480 N.W.2d 424 (1992) (reviewing court may not substitute its judgment for that of the workers' compensation court, but simply review for error); *O'Brien v. North Dakota Workmen's Compensation Bureau*, 222 N.W.2d 379 (N.D.1974) (court applies standard of review as found in North Dakota's version of the APA with no de novo review of deposition testimony). "By insisting that this court review the deposition testimony in the present case as though it was presented here in the first instance ... [we are required] to engage in the fact finding process, thereby assuming the Department's role.... The Department is in the best position to make factual determinations." *Lawler*, 435 N.W.2d at 709 n. 2. Applying this standard of review to administrative agency decisions also encourages the losing party to appeal, knowing they will receive de novo review of all deposition testimony—and may also encourage use of deposition testimony at the administrative hearing level. Since I did not prevail on this issue in *Lawler*, we will engage in the fact finding process as set out in *Guthmiller*, 502 N.W.2d at 588.

Having recognized the burden of proving all the essential facts of his claim is on the claimant, it becomes necessary to evaluate the evidence to determine whether the claimant has in fact met this burden. *It should be noted proof need not arise to a degree of absolute certainty, but an award may not be based upon mere possibility or speculative evidence. Mehlum v. Nunda Coop. Ass'n,* 74 S.D. 545, 56 N.W.2d 282 (1953). Before any award may be sustained, the findings of fact of the commissioner must be supported "by substantial, credible, and reasonable evidence." *Oviatt v. Oviatt Dairy, Inc.,* 80 S.D. 83, 119 N.W.2d 649 (1963).

*Kraft v. Kolberg Mfg. Co.,* 88 S.D. 140, 215 N.W.2d 844, 846 (1974) (emphasis added).

With these guidelines in mind, we review the testimony of the medical experts in this case.

## MEDICAL EXPERT TESTIMONY

### 1. Dr. Warren Opheim, M.D.

Dr. Opheim's opinions are presented via affidavit attached to medical reports on Foltz. Dr. Opheim practices with Neurology Associates, P.C., in Sioux Falls, South Dakota. As stated earlier, physicians in the Phoenix emergency room recommended that Foltz see a neurologist. Foltz was referred to Dr. Opheim by Cigna, Warner's insurance carrier. Dr. Opheim saw Foltz on at least ten occasions from March 1990 through February 1991. Initially, the reports show that Foltz reported symptoms including headaches, dizziness, tinnitus, and blurred vision. Dr. Opheim diagnosed post traumatic syndrome secondary to the head injury, "with headache, disequalibrium [sic] and irritability and visual blurring," and ordered various diagnostic tests including magnetic resonance imaging (MRI) scan of the neck. As time went on, the symptoms improved, and on 5/4/90, Dr. Opheim released Foltz to work to try "short hauling at first." Apparently, Warner would not allow Foltz back to work "until he gets a totally clean bill of health" as indicated in Dr. Opheim's notes of 6/7/90. Dr. Opheim did not feel he could give Foltz a total release. During that time, Dr. Opheim

referred Foltz to an ophthalmologist, Dr. Michael Pekas, M.D.; additional referrals were to Dr. Bill Arbes, Ph.D., a clinical psychologist; and Dr. Jonathan Wirtschafter, M.D., a neuro-ophthalmologist. *See* subsequent sections. In his clinical notes of 2/1/91 (from what appears to be the last appointment Foltz had with Dr. Opheim) the doctor states:

> The patient continues with his difficulty with his vision. This is unchanged, and again, I feel that his present difficulties, *even though they cannot be explained by ophthalmology* without any evidence of psychiatric or psychological problems, I think we have to assume that they are secondary to the head injury and are not going to change. This [does], I think, eliminate having him from the employment as a truck driver, and I do not think, from what I can see, that this is going to change.

(Emphasis added). Thus, Dr. Opheim never expressed an opinion that Foltz *did not suffer* a loss of peripheral vision; rather, his notes indicate that Foltz has a vision problem, and that the doctor could not explain the loss.

### 2. Dr. Bill Arbes, Ph.D.

One of the referrals made by Dr. Opheim was to Dr. Bill Arbes. Dr. Arbes is a clinical psychologist and associate professor with the Department of Psychiatry for the University of South Dakota School of Medicine. In making the referral, Dr. Opheim stated in his notes of 9/28/90 that, "John never has seemed to me to be a hysterical type of personality but in view of our inability to explain his difficulties, I think this evaluation needs to be done." In other words, the purpose of this referral was to determine if there was a psychological explanation for Foltz' problems. Apparently, Foltz met with Dr. Arbes three or four times. Dr. Arbes wrote two letters following the visits, and these letters were accepted as exhibits at the Department hearing by stipulation of counsel. Dr. Arbes ordered administration of the MMPI to Foltz, did a complete "personal/social history," and administered several other mental exams such as "proverb testing." In part, Dr. Arbes stated:

There certainly are no signs on the MMPI nor on the personal/social history taking, nor on mental status exam to suggest that this man has any symptoms consistent with a psychophysiological or somatic disorder.... There appears to be no secondary gain present to his presenting physical symptoms, and overall he is basically not the type of person who can deal with unstructured time.... *Mr. Foltz is not resisting to return to work, but quite the contrary, his desire is to return to work in some situation.*

(Emphasis added.) Thus, Dr. Arbes' statements do not indicate a belief that Foltz is either faking or imagining his vision problems.

### 3. Dr. Michael Pekas, M.D.

Dr. Michael Pekas is an ophthalmologist, practicing with the Central Plains Clinic in Sioux Falls. Dr. Opheim referred Foltz to Dr. Pekas, and Foltz first visited with Dr. Pekas in May 1990. Dr. Pekas' testimony was presented at the hearing via deposition. At the first appointment on 5/22/90, Dr. Pekas took a history and performed an examination of Foltz, including a number of visual tests. In his deposition, Dr. Pekas testified as to his findings:

He [Foltz] did reveal some mild double vision ... the rest of the examination was pretty well normal except for the visual fields, and *visual fields showed pretty much a peripheral field loss, kind of a tunnel vision type of field loss in each eye. And I told the patient* at that time that he did have some mild abnormalities that I was hoping with time, you know, would clear; that it could be associated with his, you know, with his automobile accident[.] ... [H]e had about a 30 degree central field at that time.

(Emphasis added.) Thus, it was Dr. Pekas who first informed Foltz that he had suffered a loss of peripheral vision. Dr. Pekas also examined Foltz' optic nerve head, and testified that the color of the nerve appeared normal. Foltz returned for further visual field testing two days later, and Dr. Pekas' tests revealed the same results. In January 1991, Dr. Pekas performed visual field testing on Foltz, revealing "twenty degrees central field" in each eye. Again, in September 1991, visual field tests revealed no change—approximately twenty degrees in each eye. Counsel for Warner/Cigna asked Dr. Pekas:

Q. "[D]o you have an explanation for Mr. Foltz' 20 degree field of vision?"

A. "No, I don't."

Counsel for Warner/Cigna then asked Dr. Pekas for his opinion about the vision problem, giving Dr. Pekas three choices:

Q. "Do you have an opinion as to whether this is a *psychological* problem or a *malingering* problem or an *unexplained* problem?"

A. "I'd say it's *unexplained.* I can't really tell whether it's malingering or what, but it's an unexplained problem. I can't correlate it with any pathological process."

(Emphasis added). Thus, although Dr. Pekas could not explain the problem, he did not label the source as psychological or malingering. He felt that he should see clear damage to the optic nerve head, such as loss of color. Again, Dr. Pekas was asked:

Q. "[D]o you believe that he has the 20 degree field of vision?" ...

A. "Well, it gets hard for me to answer that question because, you know, it boils down to his perceptions, you know, his subjective perceptions of what is going on. All I know is that I, again, *I cannot explain his field loss* due to any known pathological process that I can come up with."

Q. "So it boils down to Mr. Foltz' honesty in doing these tests; is that fair?"

A. "Yes."

Dr. Pekas did say that the types of visual field tests he gave to Foltz could be skewed by a patient.[4] However, Dr. Pekas did not testify to any belief that Foltz was intentionally "skewing" the exam results, or that Foltz would even know how to do so. The sub-

---

4. Dr. Pekas suggested another type of test, called a "tangent screen" that could not be skewed by the patient. This test was also suggested by Dr.

Wirtschafter. It was eventually correctly performed by Dr. Thomas C. White. *See* subsequent section describing results of this test.

stance of Dr. Pekas' testimony was that he could not explain Foltz' peripheral vision loss; he refused to testify that Foltz did not have the vision loss.

### 4. Dr. Jonathan D. Wirtschafter, M.D.

Dr. Wirtschafter is a ophthalmologist at the University of Minnesota, engaged in the subspecialty of neuro-ophthalmology. Dr. Opheim referred Foltz to Dr. Wirtschafter, who had a short consultation with Foltz on one occasion in September 1990 almost seven months after the accident. Dr. Wirtschafter's testimony was received via two depositions, one given in March 1992 and another (telephonic) deposition in April 1992. Dr. Wirtschafter stated that he did not observe traumatic damage to the optic nerve head at the time of the consultation, but could not say absolutely that a color change would have been evident in September 1990, approximately six and one-half months after the accident.

Two particular tests discussed by Dr. Wirtschafter were the Goldmann test and the Harrington wand "tangent screen" test. In the Goldmann test, targets of various sizes [5] and brightnesses are brought in from the sides while the patient looks straight ahead, and the patient is supposed to indicate when he sees them. In regard to Foltz' performance on this test, Dr. Wirtschafter stated his assumption that Foltz either "was not fully cooperative or did not understand what was required of him."

When questioned about one "common purpose" of the Harrington wand "tangent screen" test, Dr. Wirtschafter acknowledged that the test is used "to find out whether a patient is malingering or is otherwise imagining a problem with a loss of field vision." As described by Dr. Wirtschafter, the patient is shown a target at one meter; then, at two meters, the patient is shown a target double the diameter of the first target. A patient—even one with a peripheral vision loss—should then be able to see an area twice as wide. As stated by Dr. Wirtschafter, "a

malingering patient will be stuck on the fact that they ought to see ten degrees and doesn't know that when you move them back double the distance they should be able to see a wide area, so they stick with the 10 degrees even though they're now further away and ought to be able to see a wide field." Unfortunately, Dr. Wirtschafter's staff did not administer the test to Foltz in the correct manner so that a determination of "malingering" could be made. The test was only administered once, at a one meter distance; they did not move Foltz back to two meters and double the target size. However, as will be seen, ophthalmologist Dr. Thomas White did so administer the test.

In summary, Dr. Wirtschafter stated that Foltz' vision problems are "not due to some organic disease or trauma, most probably" for the reason that he found an "absence of any objective findings on the ophthalmological examination of the eye at the point in time in which I examined him." Counsel for Warner asked Dr. Wirtschafter:

Q. "[D]o you have an opinion with reasonable medical probability whether Mr. Foltz has actually lost his field of vision?

A. "I do."

Q. "And what is that opinion?"

A. "I believe he has not lost as much visual field as is shown on our test."

Later, when asked again whether Foltz had *any* loss of peripheral vision, Dr. Wirtschafter similarly stated that, "I don't think there is a loss of visual field *that is as large as or to the extent that it's being represented*." (Emphasis added.) Thus, when given the opportunity, Dr. Wirtschafter refused to testify that Foltz had no loss of peripheral vision.

### 5. Dr. Thomas C. White, M.D.

Dr. White is an ophthalmologist in Sioux Falls, practicing in the Great Plains Eye Clinic. Dr. Opheim's notes indicate that he referred Foltz to Dr. White. Dr. White gave

---

**5.** Foltz revealed a 20 degree field of vision when the target size used was a "V4e." Dr. Wirtschafter acknowledged that the target "III4e" is the correct target to use for disability rating purposes under the AMA Guides to Permanent Impairment, the size target that should be used when determining disability for social security or other litigation purposes; and that target was not used. If the correct size target had been used, the vision field may have been smaller.

a deposition and testified at the hearing; his deposition was received as an exhibit at that hearing; his testimony at the deposition and the hearing was essentially the same. Dr. White first saw Foltz in June 1991, approximately sixteen months after the accident. At that time, he noted a slight pallor or paleness to the temporal side of the optic nerve heads in both of Foltz' eyes, indicating that the nerves were not as healthy as they should be. Dr. White acknowledged that this would be a subjective observation—that two competent examiners might not agree on the presence or degree of pallor in the nerve. Dr. White administered a Goldmann test to Foltz, using the target size III–4–e, the target size recommended by the AMA for impairment evaluations. He acknowledged that if a larger size target was used (such as that used by Dr. Wirtschafter) this would be likely to show a larger field of peripheral vision. The results of the Goldmann test administered by Dr. White showed that Foltz had 10 to 12 degree peripheral vision field in the right eye, and 10 degrees peripheral vision in the left eye. Dr. White diagnosed Foltz with a "traumatic optic neuropathy" meaning that because of the trauma he had a disturbance in his optic nerve, resulting in a loss of peripheral vision.

Dr. White's office performed a tangent screen visual field test on Foltz, which is the objective test suggested by Dr. Wirtschafter as having the ability to show whether a patient's claimed peripheral vision loss is real or faked. That test was performed by an ophthalmic technician in February 1992. Dr. White described the test, and acknowledged that in the profession, it is the practice to not tell the patient before the test what the purpose or procedure is, nor is the technician informed of any anticipated results; thus, the test is performed in an unbiased manner. In Dr. White's office, the test was performed at two distances, one meter and two meters. Dr. White testified that the results of this tangent screen visual field test showed that Foltz' peripheral vision loss is organic or real, as opposed to imagined or hysterical.

Dr. White further testified that his office tested Foltz' peripheral and central vision fields on multiple dates with at least three different testing devices. Dr. White testified:

> All of these technicians then, on different instruments, showed the same pattern, consistently, of loss. In order to purposely falsify results, one would have to imagine or suppose that an individual could immediately adjust to each of these different modalities in exactly the same and proper degree, which is, you know, sort of not impossible, but certainly highly improbable, in my opinion. . . . Difficult to do. It would certainly presuppose a patient's familiarity with those instruments and testing devices.

Dr. White was questioned regarding the difference in his opinion with that of Dr. Wirtschafter, and he stated:

> [Dr. Wirtschafter] would prefer, before he calls the peripheral vision loss organic, to see some loss of central vision or central visual disturbances, which he does not see. . . . And my point is that it would be nice to have that kind of confirmation, certainly, but it is not necessary for it to exist. We cannot impose what our preferences are upon reality, of the way the patient or the disease is in reality.

In summary, Dr. White testified that the peripheral vision loss was real, and that it was caused by damage to the optic nerve.

### ANALYSIS AND DECISION

■ We note that the pivotal issue in this matter—whether Foltz has suffered a loss of peripheral vision—is chiefly dependent on the medical testimony. In its findings of fact, however, Department found that Foltz' "testimony lacks such credibility that it is disregarded." This determination is based on matters of little consequence; however, we will briefly address them.

Department places questionable reliance on two surveillance reports. In October 1990, an investigator (Gaston) hired by Cigna observed Foltz driving at high speeds on interstate and county roads, as well as walking in a store and eating. Department stated that "nothing was observed that indicated any vision problems." However, Department fails to note that Gaston's surveillance of Foltz was his first such job, after being em-

ployed for one week with an investigation company; which company Gaston left after six months to return to farming, his current occupation. Gaston was completely unaware that he was investigating a vision problem, and paid no particular attention to head or eye movements, and had no idea what Foltz could or could not see. In July 1991, a second investigator (Dirks) also hired by Cigna, observed Foltz drive around his hometown of Lennox and driving at high speeds on the interstate and county roads. Dirks testified that he was unable to "make an independent observation of [Foltz'] head movements" or eye movements. Yet, the Department found that this surveillance was indicative of a lack of peripheral vision problems. There was no testimony that a person suffering from a peripheral vision loss would be unable to drive on interstate highways.

Foltz and his wife had a joint income in 1989 (the year prior to the accident) of approximately $29,000. Foltz testified to a significant decrease in earnings, stating that the family income was "at least three times" greater before the accident. It is undisputed that Foltz has been unemployed since the accident; and he has never denied that he received Social Security and workers' compensation benefits during that time. Nevertheless, Department discredits his testimony regarding his decrease in earnings because Foltz did receive those benefits.

Foltz has worked various "odd jobs" since the accident, earning approximately $500–600. Because he did not report this income on his tax return, Department states that he has perjured himself; thus, other testimony regarding his vision loss should be discredited. Also, simply because Foltz did these odd jobs (including pushing a switch to operate a "tilt-a-whirl" at a local carnival) Department feels that he must be lying about his loss of peripheral vision. We note that Dr. Arbes, the psychologist, had apparently recommended that Foltz try to do some odd jobs to relieve the stress of being out of work.

In the early 1980s, a number of small claims over bad debts were filed against Foltz and his wife; they did not respond or contest these debts, and default judgments

were taken. At his July 1991 deposition, Foltz was asked if he had ever been involved in prior "lawsuits" and Foltz responded in the negative, later explaining that he "was thinking lawsuits in terms of lawyers and, you know, stuff like that." Department finds that Foltz lied about "prior lawsuits" and thereby uses this to discredit his other testimony.

In November 1987, Foltz was hit on the head with a tree limb and sought medical attention, complaining of blurred vision and headaches. He had no persistent problems from this injury. During his July 1991 deposition, Foltz was asked if he had been injured in any other prior accidents, and he failed to testify regarding the November 1987 tree limb incident. Again, Department uses this to discredit Foltz' testimony regarding the loss of peripheral vision.

Whether Foltz has or has not sustained a loss of peripheral vision does not rely on Foltz' testimony regarding what amount to peripheral matters: Exactly how many times or at what speeds he has driven alone; his bad debts and odd jobs; and being hit on the head with a tree limb nearly four years prior to his deposition. Whether there is an actual loss of peripheral vision depends most on the expert medical testimony—testimony that we review here as though presented for the first time, since it is largely before us in documentary form.

In the Department findings of fact, the examiner focused on the opinions of Dr. Wirtschafter and Dr. Pekas. The findings of fact contain nothing about the opinions of Dr. White, Dr. Arbes, or Dr. Opheim. Neither Dr. Wirtschafter nor Dr. Pekas were willing to testify that Foltz *simply has no loss* of peripheral vision. As previously noted, in finding of fact XXXIV, Department stated that the "weight of the medical testimony" was that Foltz has not suffered a loss of peripheral vision. We disagree. Our review of the record reveals no medical testimony stating that Foltz has not suffered a loss of peripheral vision. Rather, there is testimony by Dr. Pekas and Dr. Wirtschafter that the loss cannot be readily explained, or that it is not to the extent shown in the test results.

It is noteworthy to recognize that Foltz did not approach any physician with claims of a loss of peripheral vision. It was Dr. Pekas who informed Foltz of this loss. Foltz, with his ninth grade education, does not appear to have possessed prior knowledge of the term "peripheral vision." And, as stated by Dr. White, it is probably unlikely that an individual could so expertly and consistently fake the various test results. According to both Dr. Arbes and Dr. Opheim, Foltz appeared anxious to return to work.

Contrary to the hearing examiner's findings, Warner and Cigna failed to produce *any* medical testimony that Foltz does not have a peripheral vision loss; the testimony was only that the loss was unexplained. Thus, there is no substantial evidence to support Department's finding that Foltz has not suffered a loss of peripheral vision. Conversely, Foltz did present expert medical testimony in the form of opinion and objective test results (the tangent screen test). This testimony indicates that Foltz does have a loss of peripheral vision, and that the loss was caused by the accident of February 1990.

Because of counsel's agreement to limit the issues, the only issue reached by the Department was whether Foltz has suffered a loss of peripheral vision. As to this sole question—*whether Foltz has suffered a loss of peripheral vision*—we reverse with direction to enter judgment in favor of claimant *on that singular issue.* According to the prehearing order, the Department retained jurisdiction as to all remaining issues. Thus, the Department will be deciding any remaining issues.

MILLER, C.J., and SABERS, J., concur.

HENDERSON and AMUNDSON, JJ., dissent.

HENDERSON, Justice (dissenting).

I likewise dissent and specially join the dissent of Justice Amundson. Additionally, I dissent for the reason that the law should remain settled in South Dakota concerning the scope of review of depositions. When reviewing evidence presented by deposition, we do not apply the clearly erroneous rule but review that testimony as though presented here for the first time. *Guthmiller v. S.D. Dept. of Transp.,* 502 N.W.2d 586 (S.D. 1993); *Day v. John Morrell & Co.,* 490 N.W.2d 720 (S.D.1992); *Lien v. Miracle Span Corp.,* 456 N.W.2d 563 (S.D.1990).

AMUNDSON, Justice (dissenting).

The Department of Labor, pursuant to the agreement of the parties, was to determine whether Foltz was permanently, totally disabled due to a work-related injury. Foltz presented live testimony, in addition to his own testimony, as well as deposition testimony at the hearing. After examining the evidence, the hearing officer entered four findings of fact, which state that Foltz knowingly and falsely testified regarding matters material to the disputed issues. The decision of the Department, as evidenced in Conclusion of Law VI, states:

> As Claimant [Foltz] has failed to meet his burden of proof that he is *permanently disabled,* Claimant's [Foltz] request for permanent partial or *permanent total benefits* due to his alleged vision loss is denied. (Emphasis supplied.)

When reviewing a decision from the Department of Labor, we have given great weight to its findings because of the hearing officer's opportunity to observe and listen to the witnesses and determine their credibility. *Erickson v. Minnesota Gas Co.,* 358 N.W.2d 526 (S.D.1984). Only when left with a definite and firm conviction that a mistake has been made, on a credibility determination, should this court substitute its judgment for that of the agency. *Lien v. Miracle Span Corp.,* 456 N.W.2d 563 (S.D.1990). The Department is not required to subscribe to the testimony of a claimant but has the latitude to choose between conflicting testimony. *Kennedy v. Hubbard Milling Co.,* 465 N.W.2d 792 (S.D.1991). Foltz failed to prove that he was totally disabled.

A review of the record does not and should not leave this appellate court with a definite and firm conviction that a mistake was made on this permanent, total disability claim. Therefore, I respectfully dissent.

I am authorized to state that Justice HENDERSON joins in this dissent.