1996 SD 8

**Margaret HELMS, as Widow and Personal Representative of Bruce L. Helms, Deceased, Claimant and Appellee,**

v.

**LYNN'S, INC., Employer and Appellant,**

**and**

**The Travelers Companies, Insurer and Appellant.**

**No. 19162.**

Supreme Court of South Dakota.

Considered on Briefs Oct. 18, 1995.

Decided Jan. 24, 1996.

Rehearing Denied Feb. 20, 1996.

James G. Abourezk, Abourezk Law Office, Rapid City, for claimant and appellee.

Dennis H. Hill, of Costello, Porter, Hill, Heisterkamp & Bushnell, for appellants.

GILBERTSON, Justice.

[¶ 1] Employer Lynn's, Inc. and its insurer appeal from the circuit court's reversal of the Department of Labor's determination that Employee Helms' heart attack was not caused by his employment. We reverse the circuit court and reinstate the Department of Labor's denial of worker's compensation benefits to Helms' widow, the claimant in this action.

### FACTS AND PROCEDURE

[¶ 2] Bruce Helms was a former employee and manager of Lynn's Super Valu in Faith and Eagle Butte, South Dakota, having worked for Lynn's, Inc. for twenty-five years. He was 70 years old at the date of his death, and was retired and drawing Social Security. To supplement his income, he worked at Lynn's in Faith part-time unloading groceries from the delivery truck.

[¶ 3] On January 23, 1992, Helms arrived at Lynn's at 3:46 a.m. and spent one and one-half to two hours unloading the delivery truck. The truck driver testified he delivered 350 crates of food that morning, totalling 7,000 pounds. Tracy Veit, a high school student, assisted Helms that day. Veit carted the boxes of food out to the store shelves for display and, in fact, unloaded about one-third of the boxes from the truck. Both Veit and the delivery truck driver testified that Helms was his usual, cheerful self that morning and did not complain or appear to be sick. Veit testified Helms, who was a life-long smoker, smoked cigarettes and drank coffee during a break.

[¶ 4] Helms left Lynn's at 6:40 a.m. but did not arrive home until later in the morning, sometime between 10:00 and 11:00 a.m. Once home, Helms appeared pale and complained of nausea to his wife but when asked if he hurt anywhere, said no. Helms told his daughter the same thing when she asked. Helms laid down for awhile but when his condition did not improve, his wife drove him to a clinic 96 miles away in Hettinger, North Dakota.

[¶ 5] At the clinic, Helms was seen by Dr. Terrence Mack, a family practitioner. Helms had phoned Dr. Mack in the morning prior to leaving Faith and informed the doctor his heart was beating 120 beats per minute and that he had been having trouble with chest discomfort. When Helms saw Dr. Mack at the clinic, he was not having any chest pain but informed the doctor he had had chest pain on days previous to January 23 brought on by physical exertion such as working and walking to work, especially on cold days. This pain was relieved by rest. Dr. Mack noted no sign of distress at this visit and performed an EKG which showed signs of Helms' 1986 heart attack but no changes from his last EKG. Dr. Mack prescribed medication Helms had been on previously for his heart but which he had stopped taking and a prescription for nitroglycerin if Helms had any further chest pain. Helms and his wife then returned home after having the prescriptions filled.

[¶ 6] Helms' wife testified they returned home around 3:00 p.m. Helms stated he felt fine and ate some bread pudding. At 4:00 p.m. he had chest pain, sweating, and dizziness. Helms took two aspirin and his nitroglycerin prescription and laid down to rest. He ate supper at about 9:00 p.m. and thereafter complained of chest pain, sweating and faintness. He told his wife he had pain in his shoulders and the backs of his arms. Helms' wife drove him back to Hettinger, this time to the hospital's emergency room since the clinic was now closed. An EKG was performed at the hospital at approximately 11:00 p.m. At 11:10 p.m., a CPK MB test was administered which measured cardiac enzymes released into Helms' bloodstream and which can be used to time a heart attack.[1]

---

1. CPK stands for Creatine Phosphokinase which is an enzyme released by damaged myocardial muscle fibers; the MB (myocardial band) fraction specifically relates to damaged heart muscle.

Helms was diagnosed as having a heart attack and, because he had also developed massive gastrointestinal bleeding, was flown to Bismarck, North Dakota where both the heart specialist and the equipment he now needed were located.

[¶ 7] A third EKG was performed at 6:00 a.m. on January 24, 1992 at St. Alexius Medical Center in Bismarck, North Dakota and yet another later in the day. Also, at 6:50 a.m. a second CPK MB reading was taken. This test showed significant elevation in both the CPK and MB readings, but not enough series of tests were run to determine whether these readings indicated peak elevation. A third CPK MB was later administered but found unreliable for identifying peak elevations as heparin had been given to Helms by that time which could influence the test results. Also this third test was run on a different machine from the earlier tests making comparisons unreliable.

[¶ 8] Helms died January 31, 1992 in the Bismarck hospital.

### STANDARD OF REVIEW

[¶ 9] Our standard of review from decisions of administrative agencies is governed by SDCL 1-26-37. This statute provides:

> An aggrieved party or the agency may obtain a review of any final judgment of the circuit court under this chapter by appeal to the Supreme Court. The appeal shall be taken as in other civil cases. The Supreme Court shall give the same deference to the findings of fact, conclusions of law and final judgment of the circuit court as it does to other appeals from the circuit court. Such appeal may not be considered de novo.

However, when the issue is a question of law, the agency's actions are fully reviewable. *Caldwell v. John Morrell & Co.*, 489 N.W.2d 353, 357 (S.D.1992); *Egemo v. Flores*, 470 N.W.2d 817, 820 (S.D.1991). Further, we review the findings based on deposition testimony and documentary evidence de novo. *Caldwell*, 489 N.W.2d at 357.

The test administered to Helms was a CPK MB which was specific for the heart. Dr. Willoughby testified the CPK was normal but Helms' ten

[¶ 10] The issue we must determine is whether the record contains substantial evidence to support the agency's determination. *In re Establishing Certain Territorial Elec. Boundaries,* 318 N.W.2d 118, 121 (S.D.1982); *Nehlich v. S.D. Comprehensive Health,* 290 N.W.2d 477, 478 (S.D.1980); *Dail v. S.D. Real Estate Comm'n,* 257 N.W.2d 709, 712 (S.D.1977).

### ANALYSIS AND DECISION

[¶ 11] SDCL 62–1–1(7) defining "injury" under our workers' compensation statutes was amended in 1995 to require that the employment or employment-related activities be a major contributing cause of the employee's injury. However, Helms' injury occurred in 1992 and the law in effect when the injury occurred governs the rights of the parties. *See West v. John Morrell & Co.*, 460 N.W.2d 745, 747 (S.D.1990); *Lyons v. Lederle Laboratories*, 440 N.W.2d 769, 770 (S.D. 1989); *Wold v. Meilman Food Industries, Inc.*, 269 N.W.2d 112, 114 n1 (S.D.1978). In 1992, "injury" under our workers' compensation statutes was defined in SDCL 62–1–1(2) as "only injury arising out of and in the course of the employment, and shall not include a disease in any form except as it shall result from the injury[.]"

[¶ 12] This Court has previously defined "in the course of" as imposing a time, place, and circumstance requirement. *Zacher v. Homestake Min. Co. of Cal.*, 514 N.W.2d 394, 395 (S.D.1994): *Krier v. Dick's Linoleum Shop*, 78 S.D. 116, 119, 98 N.W.2d 486, 487 (1959). "Arising out of" requires the employment contribute to the cause of the injury. *Zacher*, 514 N.W.2d at 395. In *Caldwell*, 489 N.W.2d 353, we discussed the issue of causation:

> Before an employee can collect benefits under our worker's compensation statutes, he must establish, among other things, that there is a causal connection between his injury and his employment. That is, the injury must have 'its origin in the hazard to which the employment exposed

percent MB fraction was "sort of on the edge of being abnormal."

the employee while doing his work.' This causation requirement does not mean that the employee must prove that his employment was the proximate, direct, or sole cause of his injury; rather, the employee must show that his employment was *'a contributing factor'* to his injury.

*Id.* at 357–58 (citations omitted) (emphasis original). *See also Sudrla v. Comm. Asphalt & Materials,* 465 N.W.2d 620, 621 (S.D.1991) ("It must be established that the heart attack was brought on by strain or overexertion incident to the employment, though the exertion or strain need not be unusual or other than that occurring in the normal course of employment.") (citing *Kirnan v. Dakota Midland Hosp.,* 331 N.W.2d 72, 74 (S.D. 1983); 1A Larson, The Law of Workmen's Compensation, Sec. 12.26, at 3–348.71 (1985); *Harden v. S.D. Credit Union League, Inc.,* 87 S.D. 433, 209 N.W.2d 665 (S.D.1973); *Oviatt v. Oviatt Dairy Inc.,* 80 S.D. 83, 119 N.W.2d 649 (S.D.1963)).

[¶ 13] In workers' compensation cases regarding heart attacks, we have long held that "'to establish the causal relationship between one's employment and his subsequent heart attack, a finding must rest on the testimony of professionals because the field is one in which laymen are not qualified to express an opinion.'" *Deuschle v. Bak Constr. Co.,* 443 N.W.2d 5, 6 (S.D.1989) (quoting *Wold,* 269 N.W.2d at 115); *Podio v. American Colloid Co.,* 83 S.D. 528, 162 N.W.2d 385, 388 (1968). Both parties offered evidence on the issue of causation by deposition of their medical experts: Drs. Mack, Abrahams, Willoughby, Hoerauf, Schechter, and Sanmartin. Our de novo review of these depositions convinces us that Claimant has not met her burden of proof on this issue.

[¶ 14] As stated previously, Helms was a lifelong smoker[2] and was smoking a pack of cigarettes per day at the time of his injury and subsequent death in 1992. Dr. Abrahams, the cardiologist who saw Helms at the Bismarck, North Dakota hospital, testified that smoking was a medically recognized "precipitating cause of myocardial infarction."[3] Helms' medical history also shows that he suffered a heart attack in 1986 which his treating physician at that time, Dr. Hoerauf, stated was due to the ongoing process of hardening of the arteries involving the coronary artery circulation. This ongoing physiological process put Helms at a higher risk for heart attack in the future according to his physician, and in fact, an examination in 1989 indicated he continued to have problems with his coronary arteries. Dr. Hoerauf also noted a significant family history of heart disease; Helms' sister and mother both died of myocardial infarction and his brother had also had a myocardial infarction. Helms' treating physician in 1992, Dr. Mack, testified Helms had suffered from cardiovascular disease with angina increasing in severity for the last month or two preceding his death. Helms also had a history of chronic obstructive pulmonary disease for which he was receiving medication. Further, Helms had a history of peptic ulcer disease and bleeding ulcers prior to January 1992. During the week prior to his death, this bleeding had recurred resulting in darkened stools. Dr. Abrahams testified this bleeding produced incredible stress on Helms' already damaged heart and was a contributing factor in his death.

[¶ 15] Dr. Mack, who saw Helms at the Hettinger, North Dakota clinic on January 23, testified he believed Helms was suffering from angina, precipitated by physical activities and dissipating with rest, which was not acute myocardial infarction. He stated this is what Helms was experiencing at work and that he believed Helms had a heart attack later in the day after Dr. Mack had seen him. Dr. Mack administered the first EKG and physically examined Helms; he did not believe Helms was experiencing a heart attack at that time.

---

**2.** In fact, Helms told Dr. Abrahams he had been smoking since age nine.

**3.** In *Lawler v. Windmill Restaurant,* 435 N.W.2d 708 (S.D.1989) we noted:

A myocardial infarction is defined as an interruption of the arterial blood supply to the heart muscle resulting in the death of part of the muscle tissue. Dorland's Illustrated Medical Dictionary 778 (25th ed.1974). In layman's terms, a myocardial infarction is a heart attack.

*Id.* at 709 n. 1.

[¶ 16] Dr. Willoughby, who saw Helms the morning of January 24, testified it was *possible* that Helms' work precipitated his heart attack but further testified no one knows what was the triggering event.

[¶ 17] Dr. Abrahams, the cardiologist who treated Helms in Bismarck, testified that the World Health Organization's criteria for diagnosis of myocardial infarction are pain, EKG changes, and the CPK MB enzymes. She opined that Helms' work was a contributing factor of his heart attack, with qualifications.[4] She based her opinion, in part, upon a history of Helms having chest pains the morning of January 23. This history was contradicted by Helms' wife, daughter, and information Helms gave to Dr. Mack. She also testified however that Helms told her that:

> the episodes were exertional and almost all of them happened when he was working. He did have other episodes that happened with more extreme exertion. Hunting is the only example that I remember of that. But he stated that the episode which triggered his admission in Hettinger began when he was unloading heavy groceries from a truck at work.

[¶ 18] Dr. Sanmartin, a cardiologist hired by Lynn's, Inc., who reviewed Helms' medical records, testified by deposition that the most accurate tool for diagnosing myocardial infarction is the CPK MB. He stated that when the heart muscle dies, creatine kinase enzymes are released into the bloodstream within four to eight hours after the onset of the heart attack and generally are accompanied by chest pain. Dr. Sanmartin's testimony regarding this diagnostic tool and its effectiveness was read into the record from a cardiology text entitled *Heart Disease: Textbook of Cardiovascular Medicine* (4th ed) by Dr. Eugene Braunwald.

[¶ 19] Dr. Sanmartin concluded, within a reasonable degree of medical certainty, that Helms was having angina in the morning rather than a myocardial infarction. He based this conclusion on the timing of Helms' persistent chest pain at 4:00 p.m. rather than in the morning, the history of Helms taken by his treating physicians, and the results of the CPK MB testing performed at Hettinger at 11:10 p.m. January 23. Angina is chest pain brought on by exertion and relieved by rest which Helms had been having for several years, and which Dr. Mack testified was increasing in severity for the past two months. Dr. Sanmartin testified Helms "couldn't have had a myocardial infarction in the morning with only the CK MB being a little abnormal."

[¶ 20] Claimant has the burden of establishing the causal connection between the employment and the injury by a preponderance of the evidence and " 'a possibility is insufficient and a probability is necessary.' " *Caldwell*, 489 N.W.2d at 358; *Deuschle*, 443 N.W.2d at 6; *Wold*, 269 N.W.2d at 116; *Kirnan*, 331 N.W.2d at 74. Where the probabilities are equal, the claimant's burden is not sustained. *Caldwell*, 489 N.W.2d at 358; *King v. Johnson Bros. Constr. Co.*, 83 S.D. 69, 155 N.W.2d 183 (1967).

[¶ 21] Here, two cardiologists have testified with differing opinions regarding the causation of Helms' injury. We find Dr. Sanmartin's testimony to be more convincing than Dr. Abrahams'. We noted recently "[t]he value of an opinion of an expert witness is no better than the facts upon which it is based." *Bridge v. Karl's, Inc.*, 538 N.W.2d 521, 525 (S.D.1995). Dr. Abrahams' opinion was based, in part, on history which had been contradicted by other testimony in this case. *This case comes down to the fact that none of the other experts clearly and unequivocally were able to give the precipitating cause of Helms' injury as the work he performed on January 23, while Dr. Sanmartin's opinion is more persuasive based on his credentials and the fact it is substantiated by the evidence of this case.*

[¶ 22] We conclude that Claimant has failed to prove by a preponderance of the evidence the necessary causal connection between the injury and her husband's employment. As the record contains substantial evidence to support the agency's decision, we determine the trial court failed to appropriately apply our standard of review. We therefore reverse the trial court's order and

---

4.  Counsel did not follow up with questions as to the nature of these qualifications.

reinstate the decision of the Department of Labor denying workers' compensation benefits.

[¶ 23] MILLER, C.J., and AMUNDSON and KONENKAMP, JJ., concur.

[¶ 24] SABERS, J., dissents.

SABERS, Justice (dissenting).

[¶ 25] I agree with the trial court that there was substantial evidence that Helm's employment *was* a contributing factor to his heart attack and eventual death. Although there was *some* evidence to support the agency's findings to the contrary, it was not substantial in comparison. Therefore, the agency's findings of fact that Helm's employment was not a contributing factor to his heart attack and death were incorrect requiring reversal. The majority's position that we are bound by an agency's decision *whenever* it is based on an expert's opinion, notwithstanding substantial facts and other expert opinions to the contrary * is unacceptable under these circumstances.

---

* Dr. Abrahams, who treated Helms, testified that his heavy exertion at work was a contributing factor to the progression of the heart attack. Dr. Willoughby, who also treated Helms, noted that based on his reading of cardiac enzyme tests, the "initial heart damage occurred probably while he was working on [the] truck, or shortly thereaf-ter." In his opinion, the event which triggered the heart attack occurred in the early morning hours of January 23, 1992. Dr. Schechter, a cardiac surgeon and an expert witness for the claimant, concluded Helms' heart attack was "precipitated by his work."