1998 SD 62

**Harold MEYER, Plaintiff and Appellant,**

v.

**SOUTH DAKOTA DEPARTMENT OF SOCIAL SERVICES, Defendant and Appellee.**

**No. 20341.**

Supreme Court of South Dakota.

Considered on Briefs June 1, 1998.

Decided June 24, 1998.

Rick A. Cain of Cain & Associates, Mobridge, for plaintiff and appellant.

Mark W. Barnett, Attorney General, Joan P. Baker, Assistant Attorney General, Pierre, for defendant and appellee.

GILBERTSON, Justice.

[¶ 1.] After the South Dakota Department of Social Services (DSS) rejected his application for Medicaid, appellant Harold Meyer (Harold) received an "Administrative Fair Hearing." The hearing examiner upheld DSS' decision, as did the trial court on appeal. The sole issue raised is whether DSS improperly denied Harold Medicaid benefits. We affirm.

## FACTS AND PROCEDURE

[¶ 2.] Harold is 77 years old and had owned a ranch consisting of over 6,000 acres in Corson County, South Dakota. Harold held a portion of this land outright and some as joint tenant with his wife Lorraine who is now deceased.

[¶ 3.] In 1986, Harold was injured in an automobile accident. Harold and Lorraine (Meyers) sought the assistance of Neil Cahill (Cahill), a certified public accountant, to assist them in estate and income tax planning. Cahill discussed an estate plan with the Meyers, their children (Dianna, Wiley, Constance, and Derry), and their children's spouses. Acting upon Cahill's advice, the parties attempted to reduce Harold's estate through a series of four "gift/lend-back" transactions. Each gift/lend-back transaction began with the Meyers writing personal checks from their joint account to their four children and noting "gift" on each check. The children would immediately endorse the checks back to their parents who would deposit the uncashed checks back into their joint account. The Meyers would execute mortgages and, in most instances, promissory notes against

their ranch for the identical amount of the "gifts" borrowed back from their children.[1]

[¶ 4.] On June 20, 1991, Harold entered a nursing home. On June 25, 1991 he submitted his first Medicaid application. Harold's application was denied for failure to provide sufficient information concerning his resources. He reported $9,040 in "Lease or Rental Income" in this application for Medicaid. However, Derry leased his parent's ranch in 1991 (and again in 1992 and 1994) at the rate of $25,000 per year.

[¶ 5.] Harold's wife, Lorraine, was subsequently appointed as his guardian in 1991 and filed seven more applications, all of which were denied. Most of the applications were denied after finding Harold had excess resources. (ARSD 67:46:05:30). Efforts to secure Medicaid assistance continued and were ultimately approved. Harold received benefits from January 1, 1995, through October 1, 1996, when his benefits were terminated because of excess resources. DSS claims Harold should not have received these benefits. *See* n. 2 *infra.*

[¶ 6.] Several relevant events occurred during Harold's five-year attempt to convince DSS that his ranch was validly encumbered to his children through the gift/lend-back transactions. On August 13, 1991, Harold's Attorney, Curtis Hanks (Hanks) sent mortgage and lease information to DSS which was requested so Harold's application could be processed. Concerning the "gift" checks written by the Meyers to their children in return for the mortgages and notes, Hanks stated, "There was no money actually transferred."

[¶ 7.] In August, 1992, DSS again expressed its concerns over the transactions and requested information concerning the mortgage debt on the Meyer ranch. Attorney Hanks replied by letter "[n]o money changed hands in the mortgages." As a result, DSS denied Harold's application due to excess resources.

[¶ 8.] On May 9, 1994, CPA Cahill became involved in the application process and sent a letter to DSS indicating that Hanks "did not know what he was talking about" when he stated no money exchanged hands between the Meyer's and their children in the gift/lend-back transactions. Cahill went on to state, "[b]y looking at the documentation, you

1. Prior to the disputed transactions two mortgages existed on the ranch land. The first, dated October 18, 1986, to the United States Small Business Administration (SBA) for $62,500. The second, dated July 12, 1989, to the Farm Credit Bank of Omaha (FCB) for $160,000. The validity of these two mortgages is not disputed. The details of each transaction are as follows:

# 1   *December 27, 1989*
Harold and Lorraine each wrote $10,000 checks to each of their four children, totaling $80,000, and noted "Gift" on the face of each of the eight checks. Each child endorsed each check back to Lorraine. The next business day, December 29, 1989, the uncashed checks were deposited into the Meyers' joint bank account. That same day, the Meyers signed a promissory note and a mortgage to their four children and their spouses for $80,000. The mortgage did not require the Meyers to maintain insurance on the premises. The Meyers agreed to repay at least $6,800 each year until the year 2009. The mortgage was recorded on December 29, 1989.

# 2   *January 2, 1990*
Harold and Lorraine again wrote $10,000 checks to each of their four children, totaling $80,000, and noted "Gift" on the face of the eight checks. This time, each child endorsed each check back to Harold. On Jan-

uary 12, 1990, the Meyers signed an $80,000 promissory note along with a mortgage to their children and their spouses which contained the same terms as the previous instruments. On January 12, 1990, the uncashed checks were deposited into the Meyers' joint bank account. The mortgage was recorded on January 15, 1990.

# 3   *January 11, 1991*
Harold and Lorraine each wrote a $10,000 check from their joint account to each of their four children, for a total of $80,000, and noted "Gift" on the face of each of the eight checks. The same day, each child endorsed each check back to the parent who had written it and the uncashed checks were deposited into the Meyer's joint bank account. A mortgage dated January 11, 1991 was executed on June 24, 1991 and then recorded two days later.

# 4   *June 12, 1991*
Lorraine wrote a $50,000 check from the joint account to each of the four children and noted "Gift" on the face of each of the eight checks. Each child endorsed each check back to "Farmer's and Merchant's Bank and Trust of McIntosh." The same day, this $200,000 was deposited into the Meyers' joint account and they executed a $200,000 mortgage. Lorraine alone signed a $200,000 promissory note. The mortgage was executed on June 24, 1991, and recorded on June 26, 1991.

can see that there was consideration received for the mortgages." DSS accepted Cahill's explanation that the mortgages were valid liens against the ranch. Harold received Medicaid benefits from January 1, 1995, through October 1, 1996, when his benefits were terminated.[2] Harold's appellate attorney, Rick Cain (Cain), stated in a November 15, 1996 letter to DSS that Lorraine owned the land which was entitled to CRP payments and that Harold would not be receiving Derry's lease payment because Harold had voluntarily conveyed the property back to his children in lieu of foreclosure. In a letter dated February 5, 1997, DSS notified Cain that it was denying Harold's application. The DSS explained:

> We are still concerned about the mortgage/gift device used to transfer assets in this case. We are also concerned with actions taken after the death of [Lorraine]. A requirement of Medicaid eligibility is that [Harold] must avail himself to all resources.

[¶ 9.] Harold then requested a hearing before DSS. The administrative law judge (ALJ) found one issue decisive: whether the 1989–1991 transactions between the Meyers and their children created valid encumbrances on Harold's property thereby reducing his resources and making him eligible to receive Medicaid benefits. The ALJ held in favor of DSS that the transactions did not create valid liens against Harold's property. Additionally, the ALJ held the transactions were in violation of both state and federal Medicaid provisions as well as contrary to the public policy concerning Medicaid assistance. DSS adopted the ALJ's decision and in June, 1997; Harold appealed to the circuit court. The circuit court affirmed the DSS decision denying Harold's benefits. Harold appeals claiming the issues are:

1. Whether the notes and mortgages executed by Meyers created valid encumbrances against their real estate and therefore were improperly considered a resource for purposes of Medicaid assistance.

2. Whether the notes and mortgage instruments executed by the Meyers constitute a Medicaid Qualifying Trust (MQT).

3. Whether the gift/lend-back transactions violate public policy.

4. Whether the subject real estate should have been considered a resource to Harold.

## STANDARD OF REVIEW

[¶ 10.] Recently in *Sopko v. C & R Transfer Company*, 1998 SD 8, ¶¶ 6–7, 575 N.W.2d 225, 228–29, this court made clear the standard of review for administrative appeals:

> Our standard of review, delineated in SDCL 1–26–36, requires us to give great weight to the findings and inferences made by the Department on factual questions. *Helms v. Lynn's, Inc.*, 1996 SD 8, ¶¶ 9–10, 542 N.W.2d 764, 766; *Finck v. Northwest Sch. Dist. No. 52–3*, 417 N.W.2d 875, 878 (S.D.1988). We examine agency findings in the same manner as the circuit court to decide whether they were clearly erroneous in light of all the evidence. *In re Northwestern Bell Tel. Co.*, 382 N.W.2d 413, 415 (S.D.1986). If after careful review of the entire record we are definitely and firmly convinced a mistake has been committed, only then will we reverse. *Spitzack v. Berg Corp.*, 532 N.W.2d 72, 75 (S.D.1995) (citing *Day v. John Morrell & Co.*, 490 N.W.2d 720, 723 (S.D.1992)); *see also United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948) (origin of definition). Questions of law, of course, are fully reviewable. *Caldwell v. John Morrell & Co.*, 489 N.W.2d 353, 357 (S.D.1992); *Egemo v. Flores*, 470 N.W.2d 817, 820 (S.D.1991).

## ANALYSIS AND DECISION

[¶ 11.] **1. Whether the notes and mortgages executed by Meyers created valid encumbrances against their real estate and therefore were improperly considered a resource for purposes of Medicaid assistance.**

[¶ 12.] We begin our analysis of these gift/lend-back transactions with the

---

**2.** DSS maintains it erred in approving Harold's benefits for this time period as it believes the mortgages were not valid encumbrances upon the ranch. DSS is not seeking reimbursement for what it now claims was an error in temporary approval of benefits.

checks. Harold claims the checks to his children were gifts. The essential elements of a gift are intent, delivery, and acceptance. *Schuldies v. Millar,* 1996 SD 120, ¶ 21, 555 N.W.2d 90, 97 (citing *Owen v. Owen,* 351 N.W.2d 139, 142 (S.D.1984)). Cahill testified Harold did not have the liquidity to make the gifts at the time the checks were written and took out unsecured loans to cover them. The ALJ concluded that the checks written to Harold's children were not valid gifts after finding Harold lacked the requisite intent to transfer his assets. Under the totality of the circumstances presented, we agree with DSS that Harold did not intend the checks written to his children to operate as gifts. "The donor must intend to relinquish the right of dominion on the one hand, and to create it on the other, and this intention to make a gift must be a *present intention;* a mere intention to give in the future will not suffice." 38 Am.Jur.2d *Gifts* § 17 (1968) (emphasis added) (collecting cases).

█ [¶ 13.] In addition, a present donative intent "must be executed by a complete and unconditional delivery." 38 Am.Jur.2d *Gifts* § 18. Harold's children testified that prior to receiving the checks they were aware of the estate plan and followed Cahill's advice and direction in entering into the disputed transactions. The record supports the conclusion that the children did not expect to receive the moneys represented by the checks or exercise the rights reserved in the promissory notes and mortgages in the event of default. *See Estate of Flandreau v. Comm'r,* 994 F.2d 91, 93 (2nd Cir.1993) (holding that similar gifts conditioned upon subsequent loans not a valid attempt at avoiding federal taxes when sons and daughters-in-law of donee were acting as creditors and "never expected that the money they transferred to donee would be repaid"). Based upon the record, it is inconceivable that Harold ever intended for his children to cash the checks. If the children had demanded payment on these purported gifts Harold would have been rendered insolvent.

[¶ 14.] It is obvious the children conditionally received the checks so long as they immediately endorsed them back to their parents. In *Muserlian v. Comm'r of Internal Revenue,* 932 F.2d 109 (2nd Cir.1991), the court dealt with strikingly similar familial transactions. A parent attempted to make gifts to his children who would loan back money to the parent who then claimed interest deductions on his federal tax return. In holding the parent lacked the requisite donative intent, the second circuit found it decisive that "each loan was made only after the [children] had received a 'gift'" from their parent. *Id.* at 113. The same is true here. The *Muserlian* court concluded that by "making 'gifts' and then receiving 'loans' from his donees, the [parent] was actually borrowing his own money to create interest expense." *Id.*

█ [¶ 15.] As we find the checks written by Harold were not valid gifts, we turn next to the mortgages and promissory notes involved in the transactions. The general rule is that both mortgages and contracts must be supported by valid and sufficient consideration. *See* 54A Am.Jur.2d *Mortgages* § 29; SDCL 53–1–2. "Nothing can be treated as a consideration ... that is not intended as such by the parties." 3 Williston on Contracts *Consideration* § 7.2 (4th ed.1992) (citation omitted). The ALJ found the transactions lacked consideration on at least two grounds: first, the lack of a bargained for exchange; and second, that the promises were illusory or conditional. *See Kulikowski v. New York State Dept. of Social Services,* 166 A.D.2d 858, 563 N.Y.S.2d 536 (1990) (finding a Department of Social Services determination that individual was not entitled to Medicaid benefits as a result of his uncompensated transfer of stock and other assets to his wife was supported by substantial evidence). Harold's attorney, Hanks, wrote to DSS that no money was ever exchanged for the notes and mortgages. As noted above, it is clear that Harold never intended his children to cash the checks that had been written on his joint account. To do so would have rendered their parents insolvent. Therefore, the mortgages and supporting notes fail for lack of consideration and did not encumber the Meyer ranch for purposes of determining Medicaid eligibility.

**[¶ 16.] 2. Whether the notes and mortgage instruments executed by the Meyers constitute a Medicaid Qualifying Trust (MQT).**

[¶ 17.] A MQT is defined under ARSD 67:46:05:33,[3] which provides:

A Medicaid-qualifying trust is a nontestamentary trust or a similar legal device established before August 11, 1993, by the individual or the individual's spouse or by someone acting on the individual's or spouse's behalf that uses the individual's or spouse's funds. Under the terms of the trust, the individual may be the beneficiary of all or part of the payments from the trust or similar legal device and the distribution of payments is determined by one or more trustees who are permitted to exercise discretion regarding the distribution to the individual.

This section applies regardless of the purpose for which the trust was established.

See *Striegel v. South Dakota Dept. of Social Services,* 515 N.W.2d 245 (S.D.1994) (construing MQT provisions broadly to promote public policy supporting social assistance). ARSD 67:46:05:34 requires that the benefits of an MQT shall be deemed resources for Medicaid eligibility purposes by providing:

The amount considered available to an individual from a Medicaid-qualifying trust is the maximum undistributed amount that may be permitted under the terms of the trust assuming the full exercise of discretion by the trustee, whether or not discretion is exercised. The maximum amount available is a resource.

[¶ 18.] Even if the gift/lend-back transactions were assumed to be valid, the ALJ construed the mortgage instruments executed by Harold to fall within the MQT provisions. The ALJ stated that the children

were given the "power to foreclose on the ranch at a future point in time," that there was a lack of a "requirement that the security be insured," and that the terms of the notes "indicate[d] a lack of concern about repayment." The ALJ concluded the "mortgage instruments resemble[d] real property powers granted in trust" and while not intended to be construed as trusts by the parties were actually "a similar legal device," per ARSD 67:46:05:33, *supra,* for MQT purposes. The authority cited by the ALJ and DSS all concern rejection of inter vivos, irrevocable trusts set up for the benefit of the Medicaid applicant. None of the cases relied upon by the ALJ or DSS went so far as to hold that a constructive trust may be considered an MQT. However, we need not express an opinion as to whether the ALJ properly concluded that the Medicaid Qualifying Trust provisions applied as we have determined Harold was properly denied Medicaid benefits under issue 1.

**[¶ 19.] 3. Whether the gift/lend-back transactions violate public policy.**

■ [¶ 20.] Next we decide whether the transactions between Harold and his children and their spouses violate the spirit of the public policy behind social medical assistance.[4]

Medicaid was established by Title XIX of the Social Security Act of 1965, 79 Stat. 343, as amended, 42 U.S.C. § 1396 *et seq.* Medicaid is a joint state-federal funding program for medical assistance in which the Federal Government approves a state plan for the funding of medical services for the needy and then subsidizes a significant portion of the financial obligations the State has agreed to assume. Once a State voluntarily chooses to participate in Medicaid, the State must comply with the re-

---

3. This section was transferred from § 67:16:20:18.01, in August, 1992 and is substantially similar to its predecessor.

4. The Medicaid umbrella protects a great number of citizens who do not have the resources to provide for their own care.

In recent years, greater than sixty percent of all U.S. nursing home residents have relied on Medicaid to pay their entire bills. During 1992, state Medicaid programs spent in excess of $21 billion providing nursing home care to nearly 1.6 million qualified elderly Americans. This amount constituted more than one-fourth of all Medicaid expenditures.

Shawn Patrick Regan, Medicaid Estate Planning: *Congress' Ersatz Solution for Long–Term Health Care,* 44 Cath. U.L.Rev. 1217, 1219–20 (1995) (footnotes omitted).

quirements of Title XIX and applicable regulations.

*Alexander v. Choate,* 469 U.S. 287, 289 n. 1, 105 S.Ct. 712, 714, n. 1, 83 L.Ed.2d 661 (1985) (citing *Harris v. McRae,* 448 U.S. 297, 301, 100 S.Ct. 2671, 2680, 65 L.Ed.2d 784 (1980)).

[¶ 21.] In determining Medicaid eligibility, states are required to assess financial need only on resources available to the individual:

A state plan for medical assistance must ... include reasonable standards ... for determining eligibility for and the extent of medical assistance under the plan which ... provide for taking into account only such income and resources as are, as determined in accordance with standards prescribed by the [Secretary of Health and Human Services], available to the applicant or recipient[.]

42 U.S.C. § 1396a(a)(17).

[¶ 22.] SDCL 28–6–1, as it existed at all times relevant, provided in part:

The department of social services may provide medical services and medical or remedial care on behalf of *persons having insufficient income and resources* to meet the necessary cost thereof, *if the person has exhausted all other possible public and private medical and remedial care programs, income or benefits,* with the exception of county poor relief, in accordance with rule which the secretary of social services shall adopt pursuant to chapter 1–26 in accordance with the provisions of Title XIX of the federal Social Security Act, as amended.

(Emphasis added).

[¶ 23.] We have unequivocally stated that "[t]he Medicaid program is not to be used as an estate planning tool." *Striegel v. State Dep't of Social Serv's,* 515 N.W.2d 245, 247 (S.D.1994). Although we have not had occasion to consider a situation similar to the one presented by Harold, in *Striegel* we recognized the broad public policy behind social medical assistance:

Congress enacted the MQT provision, § 1396a(k)(2), as an addition to the "provisions designed to assure that individuals receiving nursing home and other long-term care services under Medicaid are in fact poor and have *not transferred assets that should be used to purchase the needed services before Medicaid benefits are made available."*

*Id.* (citing *Forsyth v. Rowe,* 226 Conn. 818, 629 A.2d 379, 385 (1993) (quoting H.Rep. No. 99–265, 99th Cong., 1st Sess. 71 (1985) (emphasis added))). Congressional intent would be totally frustrated if a person were allowed to abuse the purpose of Medicaid by placing his assets in an irrevocable discretionary trust paying him income for life. *Id.* at 248 (citing *Forsyth,* 629 A.2d at 385). When long-term medical care became necessary, the trustee could then exercise its discretion to withhold payments to the beneficiary thereby allowing him to qualify for Medicaid assistance while preserving assets for his heirs. *Id.*

[¶ 24.] Similarly, we see another potential for abuse if a person were allowed to engage in gift/lend-back transactions such as those between Harold and his children whereby the donor never intended such gifts to be valid and the donees recognized the purpose of the gifts were part of an overall scheme to reduce estate taxes. Cahill was not solely concerned with reducing estate taxes. Cahill's concerns over Harold's future medical bills were clear when Cahill recommended that Harold disclaim his interest in the property jointly held with his deceased wife. Cahill testified the impetus was "so the family, or the estate, however you want to look at it, would not incur significant income tax liability and the money [sic] be gone for paying nursing home bills[.]"

[¶ 25.] To permit Harold to receive Medicaid benefits while thousands of dollars are sheltered through illusory gift/lend-back transactions in an attempt to reduce estate tax consequences and increase assets available to his heirs "violates the spirit and intent of the Medicaid program and is unjust to those who do not have access to supplemental funds yet desperately need the benefits." *Striegel,* 515 N.W.2d at 248. Medicaid was designed as a safety net for those who are destitute, not free insurance coverage for those who have resources available to them to pay their medical expenses. The taxpayers should not be compelled to finance a

transfer of Harold's assets to his children. We hold under the specific facts of this case that Harold did not validly encumber his property and therefore Medicaid benefits were properly denied.

[¶ 26.] We affirm as we find the remaining issue raised by Harold to be without merit.

[¶ 27.] MILLER, C.J., and SABERS, AMUNDSON and KONENKAMP, JJ., concur.

