2000 SD 123

**Chong C. SHYKES, Claimant and Appellant,**

v.

**RAPID CITY HILTON INN, Employer and Appellee,**

and

**Traveler's Insurance Co., Insurer and Appellee,**

and

**Custom Packaging Systems, Inc., Employer and Appellee,**

and

**Traveler's Insurance Co., Insurer and Appellee.**

**Nos. 21108, 21109.**

Supreme Court of South Dakota.

Considered on Briefs Feb. 14, 2000.

Decided Sept. 6, 2000.

Mark S. Falk, Falk Law Office, Rapid City, Attorney for claimant and appellant.

Michael M. Hickey of Bangs, McCullen, Butler, Foye and Simmons, Rapid City, Attorneys for appellees' Rapid City Hilton and Traveler's Insurance.

Patricia A. Meyers of Costello, Porter, Hill, Heisterkamp, Bushnell & Carpenter, Rapid City, Attorneys for appellees Custom Packaging and Traveler's Insurance.

SABERS, Justice.

[¶ 1.] Chong Shykes brought a workers' compensation claim against Custom Packaging Systems, Inc. (Custom). The Department of Labor (DOL) determined that Chong provided timely notice to Custom and awarded her benefits. The circuit court reversed DOL and concluded that Chong was barred from recovering any benefits because she did not provide adequate notice to Custom. We affirm.

## FACTS

[¶ 2.] Chong was born March 5, 1947 in Seoul, South Korea. She attended grade school in Korea and completed the United States equivalent of the third grade. In 1991, she came to the United States with her American husband, Greg Shykes. She speaks very limited English and cannot read or write in English. Therefore, Greg assists Chong with her daily English correspondence and communications. For example, he goes with her to her doctor appointments to complete paperwork and converse with the physician, he meets with her employers and he reads and explains the contents of her mail to her.

[¶ 3.] In January 1993, Chong obtained a job at the Rapid City Hilton Inn (Hilton) as a maid. During this employment, Chong experienced a significant amount of discomfort in her arms, primarily the right arm.[1] She thought this was from hard work and expected it to get better as she got accustomed to the work. Greg feared that the pain was related to Chong's prior surgery. Therefore, during Chong's routine doctor visit in June, he discussed the problem with Dr. Overmiller. Dr. Overmiller suggested that Chong use anti-inflammatory medication coupled with certain soaks to the chest wall to alleviate the

---

1. Prior to working at Hilton, Chong did not have any difficulty with hands or arms, with the exception of some edema in her hands, which is the accumulation of fluid causing swelling and stiffness, as a residual effect from breast cancer surgeries. Chong had one breast removed in November 1985 and the second in January 1991. She then underwent reconstructive surgery and has two silicon implants.

Additionally, while living in Korea, Chong was stabbed by an assailant in 1988. This stabbing resulted in the loss of her spleen and caused serious injury to her pancreas, bladder and stomach. Consequently, she is unable to lift any object in excess of fifty pounds.

pain and to determine whether the pain was due to muscle soreness or due to a residual effect of the surgery.

[¶ 4.] Chong quit her job with Hilton on June 30, 1993. In a letter written by Chong's supervisor, Chong reported that "she couldn't work anymore because her arm was hurting her."

[¶ 5.] After her employment ended, Chong's hands and arms began to feel better. She sought a less strenuous job and applied with Custom to work in its sewing department. Greg filled out the application for Chong. Custom directed Chong to report to Dr. Waltman for a pre-employment physical. Greg completed the doctor's questionnaire for Chong. None of the tests administered by Dr. Waltman caused pain to Chong and he ultimately determined that Chong was "suitable for any employment" at Custom.

[¶ 6.] Chong was hired to work for Custom on August 2, 1993 as a seamstress. After a couple of weeks, her arms began to hurt. A co-worker told her that new employees always experienced some pain and that it would go away. Greg still feared that the pain was related to the cancer surgery. So, instead of waiting to see if it would improve, she reported to a physician practicing at Ellsworth Air Force Base, Dr. Wicks, on August 20, 1993 complaining of pain in her hands, wrists, elbows and shoulders for about two months. Dr. Wicks did not diagnose Chong, but prescribed a medication for her. He saw her again on September 3, 1993 and noted that the medication did not help alleviate the pain. He then noted: "[t]his is a chronic problem for this patient who probably does not yet understand that she must change [her] lifestyle and/or work habits and must follow through with instructions." Dr. Wicks referred Chong to Dr. Walker, an orthopedic specialist whose office is also located at Ellsworth Air Force Base.

[¶ 7.] On September 30, 1993, Chong saw Dr. Simmons, a neurologist. He reported that the cause of her problems was somewhat uncertain, and encouraged her to follow through with her appointment with Dr. Walker.

[¶ 8.] On October 20, 1993, Dr. Walker assessed Chong's problem as: "(1) lateral epicondylitis, right worse than left; (2) probable overuse tendonitis; and (3) probable dependent edema secondary to bilateral mastectomy and radical lymph node dissection of the axila." Dr. Walker felt Chong needed to slow down and placed a cast on her right arm to force her to do so. He also restricted her work activities: "No lifting, pulling, pushing with right arm. Avoid rapid, repetitive activities with left hand. Continue these [restrictions] for 2 weeks." With these restrictions, Dr. Walker indicated Chong could "safely return to work but with light duty."

[¶ 9.] When Chong reported to work at Custom with a cast on her arm, the personnel director, Bobbi Lundgren, had a difficult time communicating with her. Therefore, Lundgren contacted Dr. Walker to determine Chong's restrictions. Meanwhile, the plant manager, Gloria Mikula, decided to take Chong off work for three weeks while Chong's arm was in a cast. On October 20, 1993, Mikula filled out Chong's leave of absence form: "I request a leave of absence for the following date: 10–20 – 11–9–93 – Tennis elbow."

[¶ 10.] Because Chong did not want to take any time off, she and Greg met with Mikula. Mikula stated that they did not have any light work available for Chong, so Chong would have to take time off. Greg signed the leave of absence form for Chong.

[¶ 11.] Chong saw Dr. Walker on November 5, 1993 and he noted that there was "still quite a bit of tenderness around the lateral epicondyle of her right elbow despite the casting." Chong then began physical therapy.

[¶ 12.] On December 9, 1993, Chong saw Dr. Goff, a physical medicine and rehabilitation specialist, who assessed cumulative trauma disorder "with the right lateral

epicondylitis being the most apparent diagnosis." It was at this appointment that Chong and Greg first learned that Chong's injury was probably work-related and not related to the cancer surgery. He noted that Chong "need[s] to alter [her] work activity if she is going to control these symptoms." Dr. Goff reported: "[i]f her history is accurate, then this would be a work related injury related to the initial repetitive activities at her maid job." As a result of Dr. Goff's recommendation, Greg notified Hilton that Chong had a work-related injury. On Chong's behalf, he also completed an Employer's First Report of Injury, dated December 23, 1993.

[¶ 13.] In a letter to Dr. Walker dated December 9, 1993, Dr. Goff indicated that Chong was "reluctant to modify [her] job activity" because of her family's financial situation.

[¶ 14.] Chong received an injection in her right elbow from Dr. Goff on December 30, 1993. During a follow-up appointment on February 2, 1994, Dr. Goff reported:

There appear[s] to be two separate issues here. One is an epicondylitis [that] she apparently developed in the course of her first employment at the Hilton. She then went to work for [C]ustom [P]ackaging and developed symptoms on the left. Right symptoms have continued almost unchanged. Thus, it would appear that the initial work activity at the Hilton, according to the history, was responsible for her right upper extremity pain. The contribution of the second job to the right upper extremity symptoms is uncertain. It is possible that her work activity there presents just enough aggravation to keep it from resolving, though was not the etiology for that pain. It does, however, appear to be the etiology for her left wrist area pain.

[¶ 15.] Travelers, the workers' compensation insurance carrier for both Hilton and Custom, was investigating the claim Chong filed against Hilton on December 23, 1993. Travelers sent a letter to Chong, dated March 1, 1994:

We represent Travelers, the workers' compensation carrier for Rapid City Hilton Inn.

We have completed a review of your above captioned file. It appears from medical records that your subsequent employment with the sewing company aggravated your medical condition to the point where medical treatment was required.

As such, we must deny payment of compensation and/or medical benefits. It is our suggestion a claim be submitted through your current employer for their consideration.

Greg admitted that he read this letter, but did not file a claim with Custom because, based on what the doctors were reporting, he did not feel Custom caused Chong's injury.

[¶ 16.] On April 7, 1994, Chong signed a "Request for Medical Records" form. On this form, she authorized the hospital at Ellsworth Air Force Base (Dr. Wicks and Dr. Walker) to release her medical records associated with this injury to Custom. Lungren completed the request for Chong and also signed the form as a witness.

[¶ 17.] Chong continued to sew for Custom until May 1994. At that time, there was not enough sewing work available, so Custom required Chong to fold canvas bags. This new work involved heavier lifting and hurt Chong's arms so much that she immediately reported extreme pain to her supervisor. Chong was allowed to go home that day, May 9, 1994. On May 12, 1994, Chong was discharged "[u]ntil full Dr. release from Dr. due to [workers' compensation] problems with previous employer." Her leave of absence form stated: "While working at Hilton[,] Chong [acquired] tennis elbow, [and it] is still giving her problems."[2] Greg and Chong dis-

2. During the course of her employment with Custom, Chong requested eleven leaves of ab-

cussed the situation with Lungren on May 13 and tried to persuade her to let Chong continue sewing. Lungren testified that this was the first time that Chong and Greg told her that Chong's doctor advised her to stop working at Custom.

[¶ 18.] Chong returned to Dr. Goff on June 6, 1994. He confirmed that her medical condition had stabilized during February, March and April 1994, until she was switched over to the bag folding position in May. Dr. Goff indicated that the diagnosis "remains cumulative trauma disorder of the upper extremities." However, he noted that the disorder "appears to be under control just as long as she has a steady[ ] job that she is familiar with as the sewing."

[¶ 19.] On June 30, 1994, Chong and Greg saw an attorney to pursue Chong's workers' compensation claim against Hilton. The attorney informed them that Chong might have a compensable injury related to her work at Custom. By letter dated July 1, 1994, Chong's attorney informed Custom that Chong suffered from a cumulative trauma injury. He requested Custom to begin paying workers' compensation benefits to Chong pursuant to SDCL 62–7–38. Travelers, acting as Custom's insurer, denied the claim.

[¶ 20.] DOL determined that Chong provided timely notice to Custom and awarded workers' compensation benefits to her. The circuit court, however, determined that Chong had thirty days after March 1, 1994 to notify Custom of her work-related injury. Because Chong waited until July 1, 1994 to notify Custom, she was barred from receiving benefits. Chong appeals raising five issues, which we reduce to three:

1. Whether the circuit court erred in determining that Chong failed to provide timely notification of her work-related injury to Custom.

2. Whether DOL erred as a matter of law by denying Chong's motion for costs.

3. Whether DOL erred as a matter of law in failing to award prejudgment interest and cost of living increases to Chong.

Custom filed a notice of review raising four issues:

1. Whether DOL erred in determining that Chong did not misrepresent her physical condition to Custom.

2. Whether the circuit court erred in determining that Chong proved her disability was aggravated by her employment with Custom.

3. Whether DOL erred in determining that Chong has reached maximum medical improvement.

4. Whether DOL erred in determining that Chong was entitled to odd lot benefits.

### STANDARD OF REVIEW

[¶ 21.] We review administrative decisions the same as the circuit court. *Vaughn v. John Morrell & Co.*, 2000 SD 31, ¶ 11, 606 N.W.2d 919, 922. We will not disturb DOL's factual findings unless they are clearly erroneous. *Welch v. Automotive Co.*, 528 N.W.2d 406, 409 (S.D.1995) (citation omitted). Conclusions of law are reviewed de novo. *Id.* (citations omitted).

[¶ 22.] **WHETHER THE CIRCUIT COURT ERRED IN DETERMINING THAT CHONG FAILED TO PROVIDE TIMELY NOTIFICATION OF HER WORK–RELATED INJURY TO CUSTOM.**

[¶ 23.] The Workers' Compensation Act was enacted by the South Dakota Legislature in 1917. The purpose is to provide employees, who are injured within the scope of their employment, with reimbursement for medical care and wage benefits without having to prove the employer

sences. Each leave was documented, but Chong did not fill in any of these slips; they

were either filled in by Greg or by one of her supervisors at Custom.

was at fault or negligent. *Schipke v. Grad*, 1997 SD 38, ¶ 11, 562 N.W.2d 109, 112. In turn, employers are "granted total immunity from suit for its own negligence in exchange for payment of workers' compensation insurance." *Id.* (citations omitted). However, an injured employee must also comply with the statutory notice requirements in order to recover.

■ [¶ 24.] "The purpose of the written notice requirement is to give the employer the opportunity to investigate the injury while the facts are accessible. The notice requirement protects the employer by assuring he is alerted to the possibility of a claim so that a prompt investigation can be performed." *Westergren v. Baptist Hospital of Winner*, 1996 SD 69, ¶ 18, 549 N.W.2d 390, 395. Therefore, "[n]otice to the employer of an injury is a condition precedent to compensation." *Id.* ¶ 17.

■ [¶ 25.] "The law in effect when the injury occurred governs the rights of the parties." *Id.* ¶ 18 (citing *Helms v. Lynn's, Inc.*, 1996 SD 8, ¶ 11, 542 N.W.2d 764, 766). Prior to July 1, 1994, SDCL 62–7–10 provided that an employee, who sustained a work-related injury, had thirty days from the date of her injury to notify her employer of that injury.[3] However, the failure to provide written notification to the employer may be excused if the employer had actual knowledge of the injury or if the employee has a "reasonable excuse" for failing to comply. SDCL 62–7–10 (1993).

**A. Was written notification provided to Custom within the statutory time limitation?**

[¶ 26.] Chong argues that she was not aware that she had a compensable claim against Custom until she consulted an attorney on June 30, 1994. Therefore, she claims that her written notification on July 1, 1994 was within the time requirements of SDCL 62–7–10.

[¶ 27.] Custom argues it received insufficient notice that Chong's injury was related to the work Chong performed at Custom. In fact, Custom claims it did not receive written notice that Chong's injury was related to Custom's employment until July 1, 1994. Due to insufficient notice, Custom claims it was prejudiced because it was unable to investigate Chong's injury while the facts were readily accessible and it was denied the opportunity to minimize the seriousness of any work-related injury.

[¶ 28.] DOL determined that Chong complied with SDCL 62–7–10 by providing written notification to Custom on July 1, 1994:

> Claimant provided written notice of her injury to Custom Packaging on July 1, 1994, as soon as Claimant was informed by her legal counsel Custom Packaging might have some responsibility for providing workers compensation coverage for her cumulative trauma injury. Prior to being so informed by legal counsel, Claimant was under the impression that the Hilton was fully responsible for providing workers compensation coverage for the cumulative trauma injury.

---

3. Prior to the 1994 amendments, SDCL 62–7–10 provided:

   Every injured employee or his representative shall immediately upon the occurrence of an injury or as soon thereafter as practicable give or cause to be given to the employer written notice of the injury and the employee shall not be entitled to a physician's fee nor to any compensation which may have accrued under the terms of this title prior to the giving of such notice, unless it can be shown that the employer, his agent, or representative had knowledge of the injury or death, or that the person required to give such notice had been prevented from doing so by reason of physical or mental incapacity or the fraud or deceit of some third person or other equally good reason; but no compensation shall be payable unless written notice is given within thirty days after the occurrence of the injury or death unless reasonable excuse is made to the satisfaction of the department for not giving such notice.
   SDCL 62–7–10 (1993).

Claimant's written notice to Custom Packaging was timely.

The circuit court found that DOL was clearly erroneous in making the above finding. Instead, it determined that the thirty-day notification period was triggered by Traveler's letter dated March 1, 1994:

> This communication ... unequivocally put [Chong] and her husband on actual notice of an injury at Custom Packaging, that the injury was work related, and of [Chong's] obligation to file a notice with Custom Packaging. She had thirty days from this letter in which to give such notice under SDCL 62–7–10.

The circuit court concluded that Chong did not notify Custom within thirty days after March 1, 1994. Therefore, she was barred from recovering against Custom.

■ [¶ 29.] In determining the exact date from which the thirty-day notice requirement is triggered, we have stated that "[t]he time period for notice or claim does not begin to run until the claimant, as a reasonable person, should recognize the nature, seriousness and probable compensable character of the [the] injury or disease." *Miller v. Lake Area Hospital*, 1996 SD 89, ¶ 14, 551 N.W.2d 817, 820. Whether the claimant's conduct is reasonable is determined "in the light of [her] own education and intelligence, not in the light of the standard of some hypothetical reasonable person of the kind familiar to tort law." *Loewen v. Hyman Freightways, Inc.*, 1997 SD 2, ¶ 15, 557 N.W.2d 764, 768.

■ [¶ 30.] Chong has limited use and comprehension of the English language. Therefore, her husband, Greg, assists her with daily communications including: reading and explaining the contents of her mail to her, accompanying her to medical appointments and completing the documentation, and talking with her employers and signing and completing employment documents. Chong testified that Greg handled every document related to her employment and this injury. She admitted that Greg read and explained the documents to her.

[¶ 31.] Given the testimony and intimate nature of this spousal relationship, it is clear that Chong authorized and relied on Greg to act on her behalf. It is also clear that Greg held himself out as Chong's agent with no objection from Chong. Therefore, an agency relationship existed between Chong and Greg. *See White Motor Corp. v. Northland Ins. Co.*, 315 F.Supp. 689, 692 (D.S.D.1970) (holding a husband was bound by his wife's signature in light of her routine of signing his name to documents). When an agency relationship exists, "both principal and agent are deemed to have notice of whatever either has notice of and ought, in good faith and the exercise of ordinary care and diligence, to communicate to the other." SDCL 59–6–5. It is fair that she gets the detriments as well as the benefits associated with this relationship. Thus, the law presumes that Greg, the agent, relayed to Chong, the principal, all information that he acquired regarding her injury, and, additionally, "[t]he fact the knowledge was not actually communicated to the principal will not prevent operation of the general rule." *Aetna Life Ins. Co. v. McElvain*, 363 N.W.2d 186, 189 (S.D.1985) (citation omitted).

■ [¶ 32.] While it remains unclear whether Chong read the March 1, 1994 letter or whether Greg read it to her, it is clear that Greg read it. Under the principles of agency, Greg's knowledge of the contents of the letter is imputed to Chong. Thus, a reasonable person with Chong's education and intelligence would "recognize the nature, seriousness, and probable compensable character of [her] injury" upon receipt of this March 1 letter. Because Custom was not provided with written notification within thirty days of March 1, 1994, Chong failed to comply with SDCL 62–7–10. Therefore, Chong must prove that Custom had actual notice of her claim or that she had a "reasonable excuse" for failing to provide the requisite notice.

**B.** *Did Custom have actual knowledge that Chong had a possible compensable claim against it?*

[¶ 33.] Chong argues that Custom knew just as much as she did about her medical condition. She relies on the fact that Custom called her physicians and therapist and acquired some of the medical documents relating to this injury. While Custom knew that Chong had a claim against Hilton, Chong asserts that Custom buried its head to "any possibility that Chong may have a compensable claim involving Custom."

[¶ 34.] Custom does not deny that it called some of her physicians to inquire about her condition and to attempt to obtain any work restrictions. Custom asserts that the medical providers told them that it was acceptable for Chong to continue working as a seamstress. Therefore, Custom argues that these communications, as well as its communications with Chong and Greg, revealed that Chong's injuries were related solely to the prior employment at Hilton and not to her employment at Custom.

[¶ 35.] The circuit court first determined that Chong failed to preserve the issue that Custom had actual knowledge because it failed to file a notice of review from DOL's ruling. Despite that, the circuit court concluded that Chong "failed to meet her burden of proof to show that Custom [ ] had actual notice of any work-related injury . . . ."

[¶ 36.] In determining actual knowledge, the employee must prove that the employer had "sufficient knowledge to indicate the possibility of a compensable injury." *Streyle*, 345 N.W.2d at 866. The employee must also prove that the employer had sufficient knowledge that the injury was sustained *as a result of her employment* versus a pre-existing injury from a prior employment.

[¶ 37.] In reviewing prior cases where we determined that an employer possessed actual notice of the employee's work-related injury, one dominant theme exists: the employer was alerted to the possibility that the employee's injury was related to the current employment. *See Westergren*, 1996 SD 69, ¶ 20, 549 N.W.2d at 396 (determining that the employer, who began investigating the injury because it thought it was related to a compensable back injury the employee already sustained at this employment, had actual notice); *Schuck v. John Morrell & Co.*, 529 N.W.2d 894, 898 (S.D.1995) (concluding that the employer had actual notice based on the fact that it paid for the employee's medical expenses); *Streyle*, 345 N.W.2d at 867 (holding that actual notice was proven when the employee told the plant manager that something must have happened to her back because it hurt).

[¶ 38.] In this case, Greg testified that "[f]rom the first time [Chong] saw Dr. Goff, [Dr. Goff] asked her to quit, or modify, her work and . . . was willing to go along with her to continue sewing, as long as it [did not] further aggravate the condition." He also testified that at the February 2, 1994 appointment, Dr. Goff told Greg that any job involving repetitive hand activity would cause Chong difficulty. Greg acknowledged that even though he knew sewing to be a repetitive hand activity, he did not relay this information to Custom. He further testified that he discussed modifying Chong's work environment with her supervisors on a couple of occasions. However, he admitted that he never told them that Chong's arms were hurting because of her work at Custom.

[¶ 39.] Lungren testified that beginning in November 1993 and throughout the rest of Chong's employment, she asked Chong to provide Chong's work restrictions, but the only notice she ever received was the letter dated October 20, 1993, see text at page 3.8 through 4.1. She testified that Greg and Chong assured her that sewing was therapeutic and did not cause her pain. She contacted the therapist in an attempt to obtain any restrictions, but the therapist also told her that sewing was

acceptable work and the motions do not hurt Chong. She also testified that during the May 13, 1994 meeting with Chong and Greg, they told her that they did not disclose any restrictions to Custom for fear of losing Chong's job. In an effort to get Chong back to work at Custom, Lungren contacted Dr. Goff on July 6, 1994. During this conversation, she claims that she learned, for the first time, Chong's claim against Hilton was being contested and that Chong should not be working at Custom until that claim was resolved.

[¶ 40.] In reviewing the record evidence, it is apparent that Chong failed to prove that Custom had actual knowledge that her injury was related to the work she performed at Custom. When "the failure to give notice is at issue, the claimant has the burden of showing that for some good and sufficient reason notice could not be given." *Schuck*, 529 N.W.2d at 898. Here, the evidence shows that Chong and her husband chose not to provide timely notice to Custom for economic reasons; that is, they did not want Chong to lose her job. Therefore, Chong's claim against Custom will be allowed to proceed only if she can prove that she had a "reasonable excuse" to justify the delay in providing written notification to Custom.

C. *Did Chong have a "reasonable excuse" for failing to comply with the written notification requirement?*

[¶ 41.] Chong argues that she did not make a written claim against Custom before July 1, 1994 because she did not believe that she had a valid claim against Custom. Instead, she claims that the sewing she performed at Custom was beneficial to the injuries she thought were solely attributable to her prior employment with Hilton.

[¶ 42.] In determining compliance with SDCL 62–7–10, we have stated that "[t]he time period for notice or claim does not begin to run until the claimant, as a reasonable person, should recognize the nature, seriousness and probable compensable character of the [the] injury or disease." *Miller*, 1996 SD 89, ¶ 14, 551 N.W.2d at 820. Whether the claimant's conduct is reasonable is determined "in the light of [her] own education and intelligence, not in the light of the standard of some hypothetical reasonable person of the kind familiar to tort law." *Loewen*, 1997 SD 2, ¶ 15, 557 N.W.2d at 768.

[¶ 43.] Chong claims a subjective standard applies and that she did not know that her injuries were caused by her employment at Custom. However, the standard is based on an objective reasonable person with the same education and intelligence as the claimant's. If we were to accept Chong's argument, every claimant would be excused from complying with the notification requirement by simply claiming that she did not, in good faith, believe that she had a compensable claim against her employer.

[¶ 44.] On September 3, 1993, Dr. Wicks warned Chong that she would have to modify her working habits if she wanted to get better. Greg testified that Dr. Goff told them during their first visit, on December 9, 1993, and thereafter that Chong should not be working at Custom if she wanted to improve. He also explained to Greg what he must do to file a workers' compensation claim against Hilton. Greg filed the claim, which indicates that he knew how to do it and the importance of it. On February 2, 1994, Dr. Goff reported that it was not clear to what extent Chong's work at Custom contributed to her disorder. Based on the cumulative evidence, a reasonable person, with Chong's education and intelligence, would have known that she had a compensable claim against Custom upon receipt of the March 1 letter. In fact, as indicated, it is clear that Chong and her husband chose not to provide timely notice to Custom for their own economic reasons.

[¶ 45.] We affirm the circuit court's determination that Chong failed to comply

with the thirty-day notification requirement.[4] Furthermore, Chong failed to prove that Custom had actual knowledge that her injury arose from her employment at Custom. Nor did Chong prove that she had a "reasonable excuse" in failing to comply with SDCL 62–7–10. Since Chong's claim against Custom is barred, we need not address the remaining issues.

[¶ 46.] MILLER, Chief Justice, and AMUNDSON, KONENKAMP, and GILBERTSON, Justices, concur.

4. On February 22, 2000, we considered this case on briefs and affirmed by summary disposition. Appellant, Chong, filed a Petition for Rehearing. After much consideration and deliberation we granted same for several reasons, including the fact that it was a significant case which had been disposed of by summary disposition and without oral argument. The parties submitted briefs and we considered again and now we affirm again but by written opinion.